**BRYAN K. WALKER, ESQ.**
**OBSIDIAN LAW, PLLC**
Idaho State Bar no. 5155
walkeresq.bk@gmail.com
2712 W. Jefferson
Boise, Idaho 83702
Telephone:	(208) 275-0090
Facsimile:	(208) 275-0095

*Attorney for the Plaintiffs*

UNITED STATES DISTRICT COURT
DISTRICT OF IDAHO

| | |
|---|---|
| EDWARD WATTERS *et al.*, | CASE NO. 1:12-cv-00076-BLW |
| Plaintiffs, | |
| vs. | **BRIEF IN FURTHER SUPPORT OF PLAINTIFF'S MOTIONS FOR PRELIMINARY INJUNCTION** |
| C.L. (BUTCH) OTTER, in his official capacity as the Governor of the State of Idaho, *et al.*, | |
| Defendants. | |

This Court enjoined the defendants ("State") from dismantling, dispersing, and terminating the plaintiffs' political protest until it could hold an evidentiary hearing (Dkt. 17). Since then, the State has ceaselessly schemed to exploit loopholes in this Court's injunction so that it can target the *Occupy Boise* protest, discourage its participants, and shut it down. The plaintiffs now submit this opening brief in advance of the June 7, 2012, evidentiary hearing.

BRIEF IN FURTHER SUPPORT OF MOTIONS FOR PRELIM. INJUNCTION – Page 1

# I. BACKGROUND[1]

The plaintiffs are Idahoans who want to assemble near their Statehouse to consult together on urgent political issues and peacefully, but dramatically, protest their government's failure to effectively address those issues.  The defendants are State officials who have acted under color of law in continuing efforts to stop the plaintiffs from doing any of that.  The plaintiffs previously set out the facts leading up to the State's first legislative effort to silence their protest, in their earlier briefing (Dkt. 4-2) and their verified amended complaint (Dkt. 8). The State has relentlessly continued since then, even after this Court's injunction, to try to permanently disperse the *Occupy Boise* protest.

# II. STANDARD

The standard governing issuance of a preliminary injunction remains the same as when this Court first considered the plaintiffs' motion: an injunction should issue if the plaintiffs are likely to succeed on the merits and suffer irreparable harm absent preliminary relief, if the balance of equities tips in their favor and an injunction is in the public interest.  *Farris v. Seabrook*, No. 11-35620, ___ F.3d ___, ___, 2012 U.S. App. LEXIS 1049 at *10. (9th Cir. Jan. 19, 2012).  The plaintiffs do not have to show that they are likely to succeed, however, if the balance of equities tips sharply in their favor and there are serious questions going to the merits. *Id.*  On *First Amendment* issues, if the plaintiffs make a "colorable claim that [their] First Amendment rights have been infringed, or are threatened with infringement," the government

---

[1]  The plaintiffs are conducting discovery and are also awaiting the State's briefing and its witness and exhibit lists.  The facts surrounding this case also continue to develop apace.  The factual summary here is merely a cursory summary, and the plaintiffs incorporate the facts set forth in their first amended complaint (Dkt. 8), their previous briefing (Dkts. 4-2, 13), and their declarations (Dkts. 2-2, 2-3, 2-4, 4-3, and 4-4) by reference here as well.

BRIEF IN FURTHER SUPPORT OF MOTIONS FOR PRELIM. INJUNCTION – Page 2

bears the burden of justifying any law that may restrict *First Amendment* freedoms. *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1115 (9th Cir. 2011).

### III.  ARGUMENT

The *First* Amendment requires this Court to presume that the plaintiffs, not the State, "know best both what they want to say and how to say it." *Riley v. Nat'l Fed'n of Blind*, 487 U.S. 781, 790–791 (1988).  The speech in this case is the most protected kind, political speech, in the most protected place, a traditional public forum in plain view of the nerve center of state politics. Laws that burden this kind of speech "almost always violate the First Amendment." *Al Haramain Islamic Found., Inc., v. U.S. Dept' of Treasury*, 660 F.3d 1019, 1051 (9th Cir. 2011).

The governing law is much the same today as it was when the parties first briefed and argued the plaintiffs' preliminary injunction motion.  Accordingly, the plaintiffs ask that the Court re-read its initial briefing (Dkts. 4-2, 13), which they incorporate here by reference.  The Ninth Circuit has clarified some of the applicable *First Amendment* jurisprudence since then, and the State's relentless efforts to oust *Occupy Boise* meanwhile have made it clear that I.C. § 67-1613, in both design and enforcement, is targeted at the *Occupy Boise* protest specifically.

**A.  I.C. § 67-1613 is Motivated, Designed, and Enforced to Evict *Occupy Boise*.**

Government regulation of political speech in a public forum is presumptively unconstitutional if it is content- or viewpoint-based, whether in wording or in enforcement. *Moss v. United States Secret Service*, Nos. 10-36152 and 10-36172, ___ F.3d ___, ___, 2012 U.S. App. LEXIS 7077 at *15–16 (9th Cir. Apr. 9, 2012); *Hoye v. City of Oakland*, 653 F.3d 835, 853 (9th Cir. 2011).  Content-based regulation or enforcement can only survive the extremely strict scrutiny required by the *First Amendment* if it serves a compelling state interest in the "least restrictive manner possible." *Berger v. City of Seattle*, 569 F.3d at 1052 (9th Cir.

BRIEF IN FURTHER SUPPORT OF MOTIONS FOR PRELIM. INJUNCTION – Page 3

2009). The State must "abstain" altogether from viewpoint-based regulation or enforcement. *Moss*, \_\_\_ F.3d at \_\_\_, 2012 U.S. App. LEXIS 7077 at *16. "The principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock against Racism*, 491 U.S. 781, 791 (1989). Even regulations that are neutral on their face are content- or viewpoint-based speech restrictions if they are "motivated by the desire to suppress a particular viewpoint." *Moss*, \_\_\_ F.3d at \_\_\_, 2012 U.S. App. LEXIS 7077 at *17. Such a motive is enough by itself to establish a *First Amendment* violation, even where there is no differential treatment. *Id.* at *21. And even if the State produces a content- and viewpoint-neutral rationale for its regulation or enforcement, its rationale will fail *First Amendment* scrutiny unless it is actually non-pretextual. *Id.* at *20, *22.

The State has targeted the *Occupy Boise* for both its content and its viewpoint. Just one year before *Occupy Boise* established its symbolic presence at the Capitol Annex, the State allowed another group of private citizens, the Idaho Global War on Terrorism Association, to "occupy" those same grounds with the "Idaho Fallen Soldier Memorial." *See, e.g., Hundreds gather for unveiling of Idaho Fallen Soldier Memorial*, KTVB.com, Sept. 11, 2010, http://bit.ly/HKbn9l. The memorial permanently altered the grounds and was installed with defendant Otter's approval and the State's imprimatur. *See* C.L. "Butch" Otter, *News Release: Governor, First Lady Invite Idahoans to Idaho Fallen Soldier Memorial Unveiling*, Sept. 9, 2010, http://1.usa.gov/IpqvEN.

In contrast, when *Occupy Boise* brought its political message to the same public forum, the Idaho Department of Administration tried to find any authority it could to prohibit the demonstration. Unable to identify any, it met with defendant Otter's office to pursue other

BRIEF IN FURTHER SUPPORT OF MOTIONS FOR PRELIM. INJUNCTION – Page 4

possibilities for squelching the protest. Still finding no way to stop it, another member of defendant Otter's political party, Rep. Scott Bedke, Assistant Majority Leader in the Idaho House of Representatives, sponsored the bill that became I.C. § 67-1613, saying publicly that "the right place for people to exercise free speech is on the Capitol steps," not via a "tent city." *Idaho House drafting measure to boot Occupy Boise*, Idaho State Journal, Jan. 17, 2012, http://bit.ly/wGkJ7B.[2] During consideration of the bill, the Speaker of the House ordered the Statehouse "locked down," *Occupy Boise* participants who entered the Statehouse had their bags and effects involuntarily searched (though others' were not), and the majority party suddenly prohibited signs, buttons, stickers, and even the American flag from being displayed in front of legislators. *See* Betsy Z. Russell, *Idaho lawmakers clash with Occupy Boise again*, Spokesman-Review, Mar. 26, 2012, http://bit.ly/GSeEmr; Andrew Crisp, *Idaho Lawmakers Criticize Occupiers' U.S. Flag Inspired Wardrobes*, Boise Weekly, Feb. 7, 2012, http://bit.ly/x3JMqU. When Bedke's bill passed both houses—on nearly party-line votes—defendant Otter issued a signing statement expressly targeting *Occupy Boise*, informing the Speaker of the House that Otter would be giving *Occupy Boise* a deadline of "5 PM on Monday, February 27, 2012, to vacate the impacted state properties."[3]

Even after this Court's injunction issued, the State continued to beleaguer *Occupy Boise* with attempts to exploit perceived loopholes in the injunction's language, first claiming that the tents, the political library, and other protest supplies were "indicia of camping" that the State

---

[2]  Defendant Otter made similar remarks to the press, telling reporters that he hoped Bedke's bill would reach his desk and that *Occupy Boise* was "welcome to the Capitol steps," just not to protest in the fashion they chose. Andrew Crisp, *Governor Otter Talks Occupy Boise*, Boise Weekly, Jan. 25, 2012, http://bit.ly/HUAu7f.

[3]  Decl. Withroe ex. A (Dkt. 9-1).

BRIEF IN FURTHER SUPPORT OF MOTIONS FOR PRELIM. INJUNCTION – Page 5

could seize under I.C. §§ 67-1613 and 67-1613A.[4]  When that didn't work, less than a week after the State agreed to postpone the evidentiary hearing in this case until June 7, 2012, the State sent a letter on March 14, 2012, informing *Occupy Boise* that it had less than 48 hours to completely vacate the protest, because the "grounds must be cleared" for maintenance.[5]  The State also announced, for the first time, that it was going to erect a construction fence to exclude *Occupy Boise* from a substantial portion of the protest site.[6]  In response, *Occupy Boise* offered on multiple occasions to move the protest to a non-grassy area within clear sight of the Statehouse and the lobbyists and elected officials who frequent it. *Occupy Boise* initially suggested that potential resolution in writing on March 16, 2012, made that offer again on March 22, 2012, and then reiterated it in more detail on April 9, 2012,[7] and yet the State has never responded to it, except by enacting another new law targeted at *Occupy Boise*, authorizing the Idaho Department of Administration to take another stab, using administrative regulations, at forcing the protest away.  Act of Mar. 30, 2012, ch. 194, 2012 Idaho Sess. Laws ___ (http://www.legislature.idaho.gov/legislation/2012/H0693.htm).

While this correspondence and mulligan lawmaking was transpiring, another group of demonstrators with a different focus camped out—and slept—on the Statehouse grounds without repercussion.  *Gay, lesbian activists sleep on steps of Idaho Capitol*, KTVB.com, Mar. 15, 2012, http://bit.ly/IY2CTB.  The State did not enforce I.C. § 67-1613 against them, confirming that the statute was motivated by the State's desire to suppress *Occupy Boise*, was designed just for that

---

[4]  2d Decl. Walker ex. A.

[5]  2d Decl. Walker ex. B.

[6]  2d Decl. Walker ex. B (attachments).

[7]  2d Decl. Walker exs. C, E, J.

BRIEF IN FURTHER SUPPORT OF MOTIONS FOR PRELIM. INJUNCTION – Page 6

purpose, and is enforced only to that end.  Not only is the purpose underlying the statute neither content- nor viewpoint-neutral, but *Occupy Boise* is singled out for differential treatment under the new law.  The State has "has adopted a regulation of speech because of disagreement with the message it conveys."  *Ward v. Rock against Racism*, 491 U.S. 781, 791 (1989).  Accordingly, this Court should declare it unconstitutional and enjoin its implementation.

**B.  The State Could Easily Achieve its Legitimate Objectives without Banning Sleeping.**

As this Court has already held, the provisions of I.C. § 67-1613 do not authorize removal of *Occupy Boise*'s tent city protest.[8]  They do, however, completely ban core components of that protest—sleeping and camping.  These components, as the plaintiffs have already argued and this Court has recognized, "are imbued with great meaning as used by Occupy Boise."[9]  Because sleeping and camping is expressive conduct protected by the *First Amendment*, and the State has enacted a law infringing on that expressive conduct, the State bears the burden of justifying its speech-restrictive law.  *Thalheimer*, 645 F.3d at 1115.  At the preliminary injunction stage in *First Amendment* cases, this means that the movants "must be deemed likely to prevail unless the Government has shown that [the movants'] less restrictive alternatives are less effective" than the Government's law at promoting the purported compelling state interests.  *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004) (internal citations omitted).

The State listed its interests in I.C. § 67-1613 explicitly as part of the enactment.  None of those interests is substantial enough to survive *First Amendment* scrutiny.  Even if they were, there are obvious, less restrictive restrictions that would be more effective at promoting those interests than I.C. § 67-1613 is.

---

[8]   Mem. Decision and Order 11 (Dkt. 17).

[9]   Mem. Decision and Order 12 (Dkt. 17).

BRIEF IN FURTHER SUPPORT OF MOTIONS FOR PRELIM. INJUNCTION – Page 7

*Consistent use guidelines.*  If the goal of having "consistent" laws were a compelling enough interest to allow the government to suppress political speech, then the State could fine and jail political speakers as long as both state and local governments did it in the same way.  This, however, is clearly "at odds with *First Amendment* analyses," which do not abide purported state interests that are "unbounded and susceptible to no limiting principle."  *Citizens United v. FEC*, 130 S. Ct. 876, 910 (2010) (citation omitted).  This Court should reject the idea that governments may suppress political expression so long as they do it consistently.

Of course, I.C. § 67-1613 does not create any consistency, anyway.  Its provisions bear only passing resemblance to the City of Boise's camping ordinance.  But that is just one city among hundreds of incorporated cities and 44 counties throughout the statewide scope of I.C. § 67-1613, many of which now have laws *inconsistent* with the anti-*Occupy* law.  Moreover, if the State wanted its "consistent public use guidelines"[10] rationale to be more than a charade, it would have actually based it on an existing camping ordinance.  The City of Boise's ordinance is limited in  application to the period between sunset and sunrise, for example, and elsewhere expressly allows political demonstrations without a permit.  Boise City Code §§ 9-10-02, 5-10-03.  These alternatives are both less restrictive and would do a better job at making state public use guidelines consistent with local governments'.

*Aesthetic standards.*  Government interests in vague, inherently subjective "aesthetic standards"[11] are insufficient alone to justify speech restrictions.  *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 802 (1984).  Rather, the State must identify substantial interests undergirding its purported aesthetic interests to survive *First Amendment* scrutiny.  *Id.*;

---

[10]  Decl. Walker ex. A at ll. 19–22 (Dkt. 2-4).

[11]  Decl. Walker ex. A at ll. 17–19 (Dkt. 2-4).

BRIEF IN FURTHER SUPPORT OF MOTIONS FOR PRELIM. INJUNCTION – Page 8

*see also, e.g., United States v. Grace*, 461 U.S. 171, 177 (1983); *Perry Education Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 45 (1983); *United States v. O'Brien*, 391 U.S. 367, 377 (1968). For, "[a]s a general matter . . . in public debate our own citizens must tolerate insulting, and even outrageous, speech." *Hoye*, 653 F.3d at 853 (quoting *Schenck v. Pro-Choice Network of Western New York*, 519 U.S. 357, 383 (1997). The First Amendment requires courts to "be especially skeptical of regulations that seek to keep people in the dark for what the government perceives to be their own good." *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 501, 503 (1996). The Ninth Circuit's recent decision in *Moss* illustrates this, holding it unconstitutional for the Secret Service to keep anti-Bush protestors away from the presidential motorcade, while allowing cheering supporters near it. ___ F.3d at ___, 2012 U.S. App. LEXIS 7077 at *20–21. Otherwise, the State would have constitutional *carte blanche* to hide content- and viewpoint-discriminatory objectives under the cloak of aesthetics. *See id.* As the aesthetic purpose of I.C. § 67-1613 can only survive if buttressed by another sufficiently compelling purpose, *Taxpayers for Vincent*, 466 U.S. at 802, and the "consistent public use guidelines"[12] justification must fail, the anti-*Occupy* statute can only survive if the State's third and final justification is adequate.[13]

***Unobstructed grounds.*** Yet, that justification is wholly inadequate, too.[14] As a matter of law, the State's interest in unobstructed grounds is not compelling under a *First Amendment*

---

[12]   Decl. Walker ex. A at ll. 19–22 (Dkt. 2-4).

[13]   As the plaintiffs previously pointed out, there are less restrictive alternatives that would better advance this state interest, too. In particular, the state could enforce its existing litter laws, *Schneider v. State*, 308 U.S. 147, 162 (1939), or impose reasonable conditions and insurance requirements on expressive demonstrations, *Long Beach Area Peace Network*, 574 F.3d at 1028, 1030–1031; *cf.* I.C. §§ 18-7021, 18-7031.

[14]   Decl. Walker ex. A at ll. 12–17 (Dkt. 2-4).

analysis when applied to public open spaces such as old Ada County courthouse plaza. "In public open spaces, unlike on streets and sidewalks, permit requirements serve not to promote traffic flow but only to regulate competing uses and provide notice to the municipality of the need for additional public safety and other services." *Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1042 (9th Cir. 2006). The state could easily have tailored I.C. § 67-1613 to prevent *actual* obstruction of the sidewalks and open spaces and regulate competing uses in the Capitol Mall and elsewhere. *See id.* at 1041 ("it would have been simple enough to tailor the permitting requirement to marches, processions, and assemblies that the organizer expects or intends to actually impede traffic flow"). It did not.

In point of fact, Occupy Boise has been proactive in ensuring that such competing uses have *not* been obstructed by their demonstration, a fact of which the State is aware. A group of veterans and veterans' families, calling themselves the "Freedom Riders," met in general assembly with Occupy Boise, seeking reconfiguration of Occupy Boise's protest in order to utilize the same space for their planned Memorial Day observances. After discussion, Occupy Boise and the Freedom Riders reached an accommodation that would ensure both parties' competing use of the Capitol Annex could proceed as desired. This situation is referenced in correspondence with the State.[15] This resolution through dialogue also stands in stark contrast with the State's obstinate refusal to even discuss alternative protest accommodations with Occupy Boise.

With so many obvious less restrictive alternatives, the State cannot meet its burden to show that I.C. § 67-1613 a narrowly tailored. The plaintiffs remain likely to prevail on their claims.

---

[15] 2d Decl. Walker ex. G.

BRIEF IN FURTHER SUPPORT OF MOTIONS FOR PRELIM. INJUNCTION – Page 10

**C.  The *First Amendment* Freedom of Assembly Protects the Camping Component as Well.**

Just as sleeping and camping are core components of the *Occupy Boise* tent city protest, so too is the political assembly component.  Although it has been a long time since the Supreme Court last considered the assembly clause of the *First Amendment*, that clause is still there, and it significantly distinguishes what *Occupy Boise* is doing from the demonstration in *Clark v. CCNV*, 468 U.S. 288 (1984).  *See* John D. Inazu, *The Forgotten Freedom of Assembly*, 84 TUL. L. REV. 565, 611 & n.248 (2010).  In *Clark*, the Community for Creative Non-Violence staged a mere "demonstrat[ion of] the plight of the homeless." 468 U.S. at 291.  The major value of the demonstration's proposed camping component, the Supreme Court observed, was "facilitative." *Id.* at 296.  The camping component of the *Occupy Boise* tent city is far more than facilitative.  Its tent city is used not just a means of expression, but as a place for political assembly as well.  Idahoans from all across the state can coalesce in a single location to discuss public questions and formulate their grievances—much like the Idaho Statehouse provides a single location for legislators, just across the street, to do the same.  As the First and Second Continental Congresses evidence, discussing public questions and formulating grievances in assembly is often a multi-day, all-night affair, and those participating sometimes need to occupy a Carpenter's Hall, or the Pennsylvania Statehouse as an integral part of their work.

Public assemblies were particularly important to the political life of America during the era of our Constitution's framers.  *See* SIMON P. NEWMAN: PARADES AND THE POLITICS OF THE STREET: FESTIVE CULTURE IN THE EARLY AMERICAN REPUBLIC 2 (1997); Robert M. Chesney, *Democratic-Republican Societies, Subversion, and the Limits of Legitimate Political Dissent in the Early Republic*, 82 N.C. L. REV. 1525, 1539 (2004).  The Supreme Court has since observed that political assembly can seem "annoying" to the government and the general public, but held

BRIEF IN FURTHER SUPPORT OF MOTIONS FOR PRELIM. INJUNCTION – Page 11

that it nevertheless cannot be restricted.  *Coates v. Cincinnati*, 402 U.S. 611, 615 (1971) ("If this were not the rule, the right of the people to gather in public places for social or political purposes would be continually subject to summary suspension through the good-faith enforcement of a prohibition against annoying conduct.").  Indeed, the Supreme Court has acknowledged the special importance of the kind of assembly at the core of *Occupy Boise*'s tent city, noting that "effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association, as this Court has more than once recognized by remarking upon the close nexus between the freedoms of speech and assembly."  *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 460 (1958).

     Removing the camping component from CCNV's tent city merely threatened the size and effectiveness of that demonstration.  *Clark*, 468 U.S. at 296.  Removing the camping component from *Occupy Boise*'s demonstration slices through the free assembly artery that feeds its heart.  Inability to assemble around-the-clock near the Statehouse unequally burdens those without the wealth to rent meeting halls or office space in the "vibrant core of Idaho State Government."[16]  This Court must therefore examine the restriction of I.C. § 67-1613 "with particular care" because its "effects fall unevenly on different viewpoints and groups in society."  *See NAACP v. City of Richmond*, 743 F.2d 1346, 1356 (9th Cir. 1984).  As the Ninth Circuit has pointed out, in an era when "the extremely rich" can pay their way into the national political debate, free venues for *First Amendment* activity "must be jealously protected."  *Grossman v. City of Portland*, 33 F.3d 1200, 1205 & n.8 (9th Cir. 1994).  The plaintiffs are likely to succeed on their freedom of assembly claim.

**D.  The Property Seizure Issues are Not Moot.**

---

[16]  Decl. Walker ex. A l. 14 (Dkt. 2-4).

BRIEF IN FURTHER SUPPORT OF MOTIONS FOR PRELIM. INJUNCTION – Page 12

If this Court enjoins the State, after evidentiary hearing, from enforcing I.C. § 67-1613 at all, the property seizure issues raised by I.C. § 67-1613A may become moot. But under the existing injunction (Dkt. 17), those issues are still live and urgent for the plaintiffs. This Court's injunction apparently allows the State to seize "personal belongings related to camping, making fires, and cooking." Dkt. 17 at 15. Yet the *manner* by which I.C. § 67-1613A allows the State to seize and dispose of that property violates the Fourth and Fourteenth Amendments, as a matter of law. Because these are legal issues, rather than reiterate their earlier arguments the plaintiffs will just refer this Court to them (Dkts. 4-2, 13). Even if the State is permitted to seize certain property, this Court should enjoin the State from seizing or disposing or it in an unconstitutional manner, because the plaintiffs are likely to succeed on their Fourth and Fourteenth Amendment claims.

**E.  The Other Injunction Requirements are Still Met.**

For the same reasons that the plaintiffs explained earlier (Dkts. 4-2, 13), and this Court recognized in its injunction (Dkt. 17), the plaintiffs are likely to suffer irreparable harm if the injunction is not extended. The balance of the equities tips sharply in the plaintiffs' favor and the public interest favors extending the injunction.

**F.  Because the State has No Theory for Recovering Damages, Bond Should be Waived.**

The State has the burden of "presenting evidence that a bond is needed." *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 883 (9th Cir. 2003). Unless there is evidence that the State will suffer damages from the injunction, this Court may set the bond at zero. *Gorbach v. Reno*, 219 F.3d 1087, 1092 (9th Cir. 2000). Even if there is evidence of possible damage, bond should still be waived if a "bond would have a negative impact on

plaintiff's constitutional rights, as well as the constitutional rights of other members of the public affected." *Baca v. Moreno Valley Unified School Dist.*, 936 F. Supp. 719, 738 (C.D. Cal. 1996).

There are no damages that the State could ascribe to this Court's injunction, or the extension of it. "An improperly enjoined party may not demand damages on the bond simply because the injunction was improperly granted. He must demonstrate injury as a consequence of the injunction." *Matek v. Murat*, 862 F.2d 720, 733 (9th Cir. 1988). Although the State contends that, as a result of *Occupy Boise* using the courthouse plaza as the founding fathers contemplated it might be, the grounds will need some "restorative work,"[17] there is no theory under which the State could recover those damages. The only recovery authorized by I.C. § 67-1613 is the penalty for a state law infraction, which cannot be more than $100. I.C. § 18-111. There is no statutory authorization for the State to charge the plaintiffs a fee for using a public forum for a protest, the plaintiffs are not being unjustly enriched due to the injunction, and there is no allegation that their protest is a tort or that it breaches any contract. The State cannot recover through an injunction bond what it could not recover had the plaintiffs not been forced to sue to protect their constitutional rights. As one court observed, "[r]equiring a bond to issue before enjoining potentially unconstitutional conduct by a governmental entity simply seems inappropriate, because the rights potentially impinged by the governmental entity's actions are of such gravity that protection of those rights should not be contingent upon an ability to pay." *Bible Club v. Placentia-Yorba Linda Sch. Dist.*, 573 F. Supp. 2d 1291, 1302 (C.D. Cal. 2008) (citation and internal quotation marks omitted).

---

[17] Mem. in Supp. of Defs.' Mot. to Modify or Clarify 11 (Dkt. 24-1).

What the State truly hopes to do is effect through imposition of a bond what the *First Amendment* prohibits it from effecting otherwise: the end of the tent city protest.  This Court should set the bond at zero.

## IV.  CONCLUSION

WHEREFORE, for all of the reasons explained above, the plaintiffs respectfully ask that this Court GRANT their motion for a preliminary injunction (Dkt. 4).

DATED this 20th day of April, 2012, at Boise, Idaho.

/s/ Bryan K. Walker

Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 20th day of April, 2012, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Carl J. Withroe     carl.withroe@ag.idaho.gov
Michael S. Gilmore     mike.gilmore@ag.idaho.gov
OFFICE OF THE ATTORNEY GENERAL OF IDAHO

Thomas C. Perry     tom.perry@gov.idaho.gov
OFFICE OF THE GOVERNOR OF IDAHO
*Attorneys for Defendants*

DATED this 20th day of April, 2012.

/s/ Bryan K. Walker