UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| EDWARD WATTERS, DEAN GUNDERSON, STEVEN FARNWORTH, MATTHEW ALEXANDER NEWIRTH, individuals, and OCCUPY BOISE, an Idaho unincorporated nonprofit association,<br><br>      Plaintiffs,<br><br>  v.<br><br>C.L. (BUTCH) OTTER, in his official capacity as the Governor of the State of Idaho, TERESA LUNA, in her official capacity of the Director of the Idaho Department of Administration, and COL. G. JERRY RUSSELL, in his official capacity as the Director of the Idaho State Police,<br><br>      Defendants. | Case No. 1:12-cv-001-BLW<br><br>MEMORANDUM DECISION AND ORDER |

## INTRODUCTION

The Court has before it the State's motion to modify or clarify the Court's injunction issued on February 26, 2012. The Court heard oral argument on June 7, 2012, and took the motion under advisement. For the reasons set forth below the Court will grant the State's motion. Occupy Boise shall be allowed to maintain its symbolic tent city in accordance with the Court's February 26, 2012 injunction. But it shall temporarily vacate the grounds to allow the Idaho Department of Administration access so it may assess the damage and develop and implement a rehabilitation plan. Once that is completed, Occupy Boise shall be allowed to return to the Annex grounds subject to the routine grounds maintenance schedule.[1]

## BACKGROUND

In November 2011, Occupy Boise, in solidarity with the Occupy Wall Street movement, erected a tent city on the Capitol Annex grounds to protest income inequality. Occupy Boise placed the tent city on a public plaza in direct view of the Idaho Statehouse, the Idaho Supreme Court building, and other nearby government buildings. As part of their protest, Occupy Boise participants camped on the Annex grounds round-the-clock – cooking, eating, and sleeping there.

---

[1] In the State's motion, it also asked that the injunction be modified to allow the State to fence and close portions of the Capitol Annex grounds for the Annex renovation project. At oral argument, counsel for the State represented that Occupy Boise already had accommodated this request and moved their tents to allow construction of the fence. Therefore, at the time of this decision, the Court understands that there is no longer any need to address this issue.

On February 21, 2012, Governor Otter signed into law a bill banning camping on state grounds and issued a directive requiring Occupy Boise to remove the symbolic tent city from the Capitol Annex grounds by 5 p.m. on February 27, 2012.  Occupy Boise moved to enjoin enforcement of the no-camping statutes and the Governor's edict directing the occupants to permanently vacate the site.

On February 26, 2012, the Court entered a decision enjoining the state from removing the symbolic tent city but denying Occupy Boise's request to enjoin the ban on camping.  Since the Court entered the preliminary injunction, Occupy Boise participants no longer camp on the grounds, but the symbolic tent city remains.

According to the Department of Administration, which manages the Capital mall grounds, Occupy Boise's continued round-the-clock presence at the Annex prevents it from conducting seasonal maintenance.  Between mid-March and November each year, each property within the mall area is usually mowed once a week.  *Id.* ¶ 6.  The Department mows the Capitol Annex on Wednesdays, weather permitting.  *Id.* ¶ 6.  Before mowing any area, the groundskeeper visually inspects the grounds for debris, as foreign objects can create significant safety hazards and damage the mowers.  *Id.* ¶ 7.

In addition to weekly mowing, seasonal maintenance of the grounds includes regular watering.  The Department has installed "an Acclima-brand moisture sensor system" to water the grassy areas in the Capitol mall.  *Id.* ¶ 8.  The system "senses the amount of water in the soil and automatically waters based on the soil moisture content." *Id.*  The system saves the State money because it uses less water.  *Id.*  The Department

has set up the watering system so that it waters in the night or early morning hours – typically between 7:00 pm and 7:30 am. *Id.* ¶ 9. The Department has determined "this is the best time to block for watering and allows all zones to perform a complete cycle." *Id.* If grass areas are covered by tents or tarps, they will not receive adequate water. *Id.* The tarps or tents could also obstruct the sprinkler heads, which are of the "pop-up" variety; if not allowed to pop up, the sprinkler heads may be damaged or may flood the immediate areas. *Id.*

There are other maintenance needs on the Capitol mall. *Id.* ¶ 10. As part of seasonal maintenance, the Department fertilizes several times between March and November. *Id.* It also aerates the ground during the spring, and it must repair sprinkler heads from time to time. *Id.*

Because grass must be free of debris and other obstructions to be mowed, the Department needs Occupy Boise to remove its encampment every Wednesday to allow for weekly mowing. Likewise, because grass cannot be properly watered if covered by tents or tarps, the Department needs Occupy Boise to remove the encampment every night for watering. The Department may also require Occupy Boise to remove portions of the encampment to address other maintenance needs that arise from time to time.

Along with needed unobstructed access for routine maintenance, the Department asks Occupy Boise to clear the area so the Department may assess the "significant damage" to the grounds caused by the tent city and to develop and execute a rehabilitation plan. *Id.* ¶¶ 11-15. The Department regularly assesses the condition of the

Capitol mall grounds. *Id* ¶ 13. Ric Johnston, the Facilities Services Manager in charge of overseeing management of the mall grounds, states that the presence of the Occupy Boise tents and structures has hampered his complete assessment of the grounds. *Id.* But from what he has observed, he predicts that the Department will need to re-seed or re-sod (or both) approximately 10,000 to 25,000 square feet of grass. *Id.*

At oral argument, counsel for the State clarified that the Department would need one week to assess the damage and an additional seven weeks to develop and implement a rehabilitation plan. If allowed, this would require Occupy Boise to vacate the Capitol Annex for eight weeks.

To accommodate these needs for repairs and maintenance, the State asks the Court to modify or clarify the injunction to allow the state unobstructed access to the Capitol Annex grounds to conduct repairs and routine maintenance. If the Court denies the motion to modify the injunction, the State requests that Occupy Boise post a bond of $10,000 to cover the costs of repairs caused by the inability to access the grounds to conduct needed maintenance and repair activities.

## ANALYSIS

The existing injunction prohibits the state from removing Occupy Boise's symbolic tent city from the Capitol Annex grounds. But does the injunction prohibit the state from conducting routine grounds maintenance or repairing damage caused by the encampment? Occupy Boise argues that the state already presented this issue at the injunction hearing, and this Court already concluded that the State could do nothing to

dismantle the symbolic tent city, even temporarily, without infringing on Occupy Boise's First Amendment rights.

The Court does not believe it decided, or even considered, this issue.  In response to Occupy Boise's motion to enjoin enforcement of the no-camping statutes, the State argued that it had a substantial interest in maintaining aesthetics on state property, which it sought to further through its ban on camping.  *Def's Opp'n to TRO* at 7.  The State, admittedly, spoke generally of an interest in property maintenance but only in the context of prohibiting camping on state grounds.  The need to mow or water the lawn was never mentioned because, presumably, it was February and the grounds are not typically watered or mowed in February; and, more importantly, seasonal maintenance was not at issue.  The only issue before the Court was the state's outright ban on camping, and whether the ban was broad enough to permit the Governor to remove the symbolic tent city.

It is also worth noting that in February the Governor had issued an edict, in conjunction with the passage of the no-camping statutes, targeting Occupy Boise and seeking to oust its constitutionally protected political protest permanently.  Now the State only asks that Occupy Boise vacate the grounds temporarily so it can implement the same routine maintenance schedule it implements every year.  Every year the Capitol mall grounds are aerated, fertilized, mowed, and watered.  The same mowing schedule has been in place for the last five years.  And at oral argument, counsel for the state represented that the automatic sprinkler system was installed before Occupy Boise

**MEMORANDUM DECISION AND ORDER - 6**

arrived.  This latter request of Occupy Boise to vacate the grounds temporarily therefore presents a much different question than the issue presented during the February hearing.

Courts issuing preliminary injunctions have the authority to modify them to account for changed circumstances. *See United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 248 (1968) (noting a district court has the authority to modify a decree according to "changed conditions").  In February when the Court issued the injunction, the Capitol mall grounds were not being mowed and watered.  Now it is June, and maintenance needs have changed.  The Court therefore has the authority to examine its injunction to determine whether it should be modified to accommodate the State's routine maintenance needs.  This question depends on whether the proposed repair and maintenance schedule serves as a reasonable time, manner, and place restriction on Occupy Boise's constitutionally protected expressive conduct.

Expressive conduct – even at traditional public forums – is subject to content neutral time, manner, and place restrictions. *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984).  Indeed, "[t]he government generally has a freer hand in restricting expressive conduct than it has in restricting the written or spoken word." *Texas v. Johnson*, 491 U.S. 397, 406 (1989).  Restrictions on expression "are valid provided that they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Clark*, 468 U.S. at 293.

Unquestionably, the government may not "proscribe particular conduct *because* it has expressive elements." *Texas v. Johnson*, 491 U.S. 397, 406 (1989) (emphasis in original). The government's purpose controls, and content-based restrictions on political speech are subjected to the most "exacting scrutiny." *Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1022 (9th Cir. 2009). Content-based exemptions may pass constitutional muster only if they are the least restrictive means to further a compelling interest. *See Hoyle v City of Oakland*, 653 F.3d 835, 853 (9th Cir. 2011).

Here, however, Occupy Boise fails to show that the State's planned repair and maintenance schedule targets speech. Occupy Boise presents no evidence that the State concocted a routine maintenance schedule as a ruse to silence their demonstration. To the contrary, the evidence shows that the limitations imposed by the State's requiring all personal property be removed temporarily to facilitate the Department's regular mowing and watering schedule applies equally to all groups using Capitol mall grounds without regard to speaker or message. These limitations are therefore content neutral because they do not distinguish between favored speech and disfavored speech based on the ideas or views expressed. *Hill v. Colorado*, 530 U.S. 703, 719 (2000).

Because it appears the restrictions imposed through the routine maintenance schedule are content neutral, the State must only show that they are narrowly tailored to advance a significant governmental interest. A regular maintenance and repair of state property is a substantial government interest. *See, e.g., Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984). "The State, no less than a private owner of property,

has the power to preserve the property under its control for the use to which it is lawfully dedicated." *Adderly v. State of Florida*, 385 U.S. 39, 48 (1967).  And asking Occupy Boise to temporarily vacate the Annex grounds narrowly focuses on this interest: the grounds cannot be rehabilitated nor can grass be mowed or watered if it is not temporarily free of tents and other property.

Contrary to counsel's suggestion during oral argument, Occupy Boise's round-the-clock protest cannot be analogized to our national pastime. Interrupting their round-the-clock protest to permit maintenance of the area is not the same as stopping a baseball game in the fifth inning to mow and water the field.  In fact, minor maintenance, such as spraying and smoothing the infield routinely occurs between innings.  Moreover, a baseball game ends. There is therefore no need for the grounds crew to clear the field during the game to mow and water the grass.  But such a need does exist in this case.

Occupy Boise, however, accuses the State of talking "about the grounds around the Statehouse as if they're the defendants' own personal, private lawns." *Pls' Resp.* at 5, Dkt. 27.  But it is Occupy Boise who has seized possession of the Annex lawn in the name of the 99%, preventing the State from maintaining it and allowing it to be damaged at the expense of the taxpayers.  To allow Occupy Boise's vigil to continue 24 hours a day, seven days a week without allowing for routine maintenance and repairs would be wholly inimical to the State and public's interest in maintaining the Capitol Mall grounds. *Clark*, 468 U.S. at 293.

Finally, the restrictions on Occupy Boise's vigil leave it ample opportunity to communicate its message – Occupy Boise may still maintain its symbolic tent city so long as it does not interfere with the State's legitimate repair, maintenance, and construction activities. The occupants may return once the repair is done, and the maintenance schedule only requires the occupants to vacate at specified intervals. These minor restrictions will not unduly impede Occupy Boise's avenues for communicating its message.

For all of these reasons, the Court will grant the State's motion to clarify or modify the February 26 injunction. Occupy Boise must temporarily vacate the Annex grounds for up to eight weeks to allow the Department of Administration time to assess the damage and develop and execute a rehabilitation plan.[2] Occupy Boise must vacate the grounds by June 13, 2012.[3] Once Occupy Boise resumes its vigil, it must grant the Department unobstructed access to water and mow the lawn at the scheduled times. Occupy Boise must also allow the Department occasional access for aeration, fertilization, and other need maintenance.

---

[2] The Court expects that the Department of Administration will complete the rehabilitation process as quickly as possible, and give counsel suitable advance notice of when the rehabilitation will be completed so that Occupy Boise may re-erect their symbolic tent city.

[3] If this deadline presents any problems for either side, the parties may notify the Court.

## ORDER

**IT IS ORDERED that** Defendants' Motion to Modify or Clarify Preliminary Injunction Pursuant to Fed.R.Civ.P. 54(b) (Dkt. 24) is GRANTED as set forth above.

DATED: June 8, 2012

B. Lynn Winmill
Chief Judge
United States District Court