LAWRENCE G. WASDEN
ATTORNEY GENERAL

STEVEN L. OLSEN, ISB #3586
Chief of Civil Litigation

MICHAEL S. GILMORE, ISB #1625
CARL J. WITHROE, ISB #7051
CLAY R. SMITH, ISB #6385
954 W. Jefferson Street, 2nd Floor
P.O. Box 83720
Boise, ID  83720-0010
Telephone:  (208) 334-2400
Facsimile:  (208) 854-8073
mike.gilmore@ag.idaho.gov
carl.withroe@ag.idaho.gov
clay.smith@ag.idaho.gov
Attorneys for Defendants

THOMAS C. PERRY, ISB #7203
Counsel to the Governor
Office of the Governor
P.O. Box 83720
Boise, ID  83720-0034
Telephone:  (208) 334-2100
Facsimile:  (208) 334-3454
tom.perry@gov.idaho.gov

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| EDWARD WATTERS, DEAN GUNDERSON, STEVEN FARNWORTH, MATTHEW ALEXANDER NEIWIRTH, individuals, and OCCUPY BOISE, an Idaho unincorporated nonprofit association,<br><br>          Plaintiffs,<br><br>vs.<br><br>C.L. (BUTCH) OTTER, in his official capacity as the Governor of the State of Idaho, TERESA LUNA, in her official capacity as the Director of the Idaho Department of Administration, and COL. G. JERRY RUSSELL, in his official capacity as the Director of the Idaho State Police,<br><br>          Defendants. | Case No. 1:12-cv-00076-BLW<br><br><br><br><br><br>**RESPONSE TO MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. 84) FILED DECEMBER 12, 2012** |

# TABLE OF CONTENTS

INTRODUCTION ........................................................................ 1

ARGUMENT.............................................................................. 2

I.      APPLICABLE FACIAL CHALLENGE STANDARDS ......... 2

      A.    Facial Vagueness Challenge Standards......................... 2

      B.    Facial Overbreadth Challenge Standards ...................... 3

II.     THE "RECREATIONAL USE" AND "PUBLIC BUSINESS" COMPONENTS OF THE "PUBLIC USE" DEFINITION ARE NOT IMPERMISSIBLY VAGUE........................................... 5

      A.    Recreational Use ........................................................... 6

      B.    Public Business ............................................................. 8

III.    THE RULES FACIALLY CHALLENGED ON OVERBREADTH GROUNDS WITHSTAND SCRUTINY UNDER APPLICABLE STANDARDS ................................... 9

      A.    Seven-Day Duration Limit............................................ 9

      B.    Hours Limitation .......................................................... 12

            1.    Failure to Advance Significant State Interest................................................................. 12

            2.    Lack of Narrow Tailoring ................................... 14

      C.    Staking and Chalking .................................................... 15

            1.    Staking................................................................ 15

            2.    Chalking ............................................................. 15

      D.    Grounds Maintenance And Improvements .................... 16

      E.    State Events ................................................................... 18

F.      Indemnification ................................................................ 19

IV.    THE JEFFERSON STREET STEPS' RESERVATION
       PROVISIONS SATISFY PERMIT-RELATED TIME,
       MANNER AND PLACE REQUIREMENTS ON THEIR
       FACE        ............................................................................. 21

CONCLUSION        ....................................................................... 25

# TABLE OF CASES AND AUTHORITIES

## CASES

*Adderly v. Florida*, 385 U.S. 39 (1967)............................................................ 17

*Affiliate v. City of Seattle*, 550 F.3d 788 (9th Cir. 2008)................................. 23

*Board of Airport Commissioners v. Jews for Jesus, Inc.*,
  482 U.S. 569 (1987) ............................................................................... 8

*Botosan v. Paul McNally Realty*, 216 F.3d 827 (9th Cir. 2000) ..................... 3

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973)................................................. 4

*Cal. Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141
  (9th Cir. 2001) ...................................................................................... 3

*City of Chicago v. Morales*, 527 U.S. 41 (1999)............................................. 2, 7

*Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288 (1984) .................. 11, 13, 17

*Coates v. City of Cincinnati*, 402 U.S. 611 (1971)......................................... 3

*Cox v. New Hampshire*, 312 U.S. 569 (1941) ................................................. 23

*Forsyth County v. Nationalist Movement*, 505 U.S. 123 (1992).................... 24

*G.K. Ltd. Travel v. City of Lake Oswego*, 436 F.3d 1064 (9th Cir. 2006) ...... 15

*Gospel Missions of Cal. v. City of Los Angeles*, 419 F.3d 1042
  (9th Cir. 2005) ...................................................................................... 3

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ........................................ 3

*Grossman v. City of Portland*, 33 F.3d 1200 (9th Cir. 1993)......................... 13

*Kaahumanu v. Hawaii*, 682 F.3d 789 (9th Cir. 2012)..................................... *passim*

*Long Beach Area Peace Network v. City of Long Beach*,
  574 F.3d 1011 (9th Cir. 2009)............................................................... 20, 21, 23

*Los Angeles Police Dep't v. United Reporting Pub. Corp.,*
    528 U.S. 32 (1999) ................................................................. 4, 5

*Mahoney v. Doe*, 642 F.3d 1112 (D.C. Cir. 2011) ........................................ 16

*Members of City Council v. Taxpayers for Vincent*,
    466 U.S. 789 (1984) ............................................................... 4

*Menotti v. City of Seattle*, 409 F.3d 1113 (9th Cir. 2005) ............................... 11

*NAACP, Western Region v. City of Richmond*,
    743 F.3d 1346 (9th Cir. 1984) ............................................. 23

*Occupy Minneapolis v. County of Hennepin*, 866 F. Supp. 2d 1062
    (D. Minn. 2011) .................................................................... 16

*Santa Monica Food Not Bombs v. City of Santa Monica*,
    450 F.3d 1022 (9th Cir. 2006) ............................................. 10, 12

*Stacy v. Williams*, 306 F. Supp. 963 (N.D. Miss. 1969) ................................. 22

*Thomas v. Chicago Park District*, 534 U.S. 316 (2002) ................................. 23, 24

*United States v. Albertini*, 472 U.S. 675 (1985) ............................................. 11

*United States v. Schales*, 546 F.3d 965 (9th Cir. 2008) ................................. 3

*United States v. Stevens*, 130 S. Ct. 1577 (2010) ........................................... 3

*United States v. Williams*, 553 U.S. 285 (2008) ............................................. 2, 3

*Virginia v. Hicks*, 539 U.S. 113 (2003) ........................................................... 5

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ...................................... 2, 12

*Wash. State Grange v. Wash. State Republican Party*,
    552 U.S. 442 (2008) ............................................................. 4

# AUTHORITIES

## United States Code

42 U.S.C. § 1983 ........................................................................................ 13

## Idaho Code

§§ 40-1313, -1412, -2319 ......................................................................... 14
§ 67-5248 .............................................................................................. 24
§ 67-5291 .............................................................................................. 1
§§ 67-5701 to -5792 ................................................................................. 24
§ 67-5709 .............................................................................................. 1
§§ 67-1613 and -1613A............................................................................ 9

## Idaho Administrative Rules

38.04.06 .............................................................................................. 1
38.04.06.010.04 ........................................................................................ 19
38.04.06.010.08 ........................................................................................ 6
38.04.06.010.13 ........................................................................................ 6
38.04.06.010.15 ........................................................................................ 9, 19
38.04.06.200.04 ........................................................................................ 16
38.04.06.201 ............................................................................................ 9, 10
38.04.06.203.03 ........................................................................................ 9
38.04.06.301.04 ........................................................................................ 9
38.04.06.302.01 ........................................................................................ 9
38.04.06.302.02 ........................................................................................ 9
38.04.06.302.04 ........................................................................... 9, 16, 18
38.04.06.310.05 ........................................................................................ 9, 19
38.04.06.310.08 ........................................................................................ 9, 15
38.04.06.400.01 ........................................................................................ 20
38.04.06.400.03 ........................................................................................ 9
38.04.07.010.05 ........................................................................................ 6
38.04.08 .............................................................................................. 1
38.04.08.010.05 ........................................................................................ 6
38.04.08.010.06 ........................................................................................ 6
38.04.08.010.10 ........................................................................................ 6
38.04.08.010.14 ........................................................................................ 9, 19
38.04.08.200.04 ........................................................................................ 16
38.04.08.201 ............................................................................................ 9
38.04.08.203.03 ........................................................................................ 9

38.04.08.301.04 ........................................................................... 9
38.04.08.302.01.a ........................................................................ 9
38.04.08.302.01.e ........................................................................ 16, 18
38.04.08.310.05 ........................................................................... 9
38.04.08.310.08 ........................................................................... 9, 15
38.04.08.400.01 ........................................................................... 21
38.04.08.400.05 ........................................................................... 21
38.04.08.400.07 ........................................................................... 21
38.04.08.400.08 ........................................................................... 22
38.04.08.401.02.i ......................................................................... 22
38.04.08.402 ............................................................................... 22
38.04.08.500.01 ........................................................................... 20
38.04.08.500.03 ........................................................................... 9, 20

## Other Authorities

12-5 Idaho Admin. Bull. 91-115 (May 2, 2012) ........................................... 1
12-6 Idaho Admin. Bull. 30-45 (June 6, 2012) ............................................ 1
12-10 Idaho Admin. Bull. 902-22 (Oct. 3, 2012) .......................................... 1
12-12 Idaho Admin. Bull. 64-66 (Dec. 5, 2012) ........................................... 1
Idaho Session Laws ch. 17 ................................................................ 9
*Merriam Webster's Collegiate Dictionary* 977 (10th ed. 1998) ..................... 6, 8

## INTRODUCTION

Plaintiffs Edward Watters *et al.* (collectively, "Occupy Boise" or "organization") request summary judgment with respect to various temporary rules adopted by the Idaho Department of Administration ("Department") pursuant to Idaho Code § 67-5709 regulating use of the Capital Mall exterior property. *See* IDAPA 38.04.06 (Rules Governing Use of the Exterior of State Property in the Capitol Mall and Other State Facilities); *id.* 38.04.08 (Rules Governing Use of Idaho State Capitol Exterior). The temporary rules initially became effective by their terms on April 17, 2012. 12-5 Idaho Admin. Bull. 91-115 (May 2, 2012). They were amended effective May 14, 2012 (12-6 Idaho Admin. Bull. 30-45 (June 6, 2012)) and were rescinded on October 3, 2012, with new temporary and proposed rules simultaneously issued (12-10 Idaho Admin. Bull. 902-22 (Oct. 3, 2012)). The Department has submitted the current temporary and the proposed rules to the 2013 session of the Idaho Legislature for review under Idaho Code § 67-5291. 12-12 Idaho Admin. Bull. 64-66 (Dec. 5, 2012).

Occupy Boise advances four general arguments. *First*, the exterior rules are not content neutral given the definitions of "Events," "Exhibits" and "Public Use" that are substantively common to each set. *Second*, the scope of two elements of the Public Use definition—"recreational use" and "public business"—and the "State Events and Exhibits" definition are impermissibly vague. *Third*, the restrictions in the rules for Events and Exhibits with regard to hours, duration, location, grounds maintenance, ground staking, and side-walk marking are impermissibly overbroad. *Fourth*, the rules' Jefferson Street Steps permitting provisions, including the authority to require permittee bonds, invest too much discretion in state officials, are overbroad in some respects, and are not narrowly tailored in others. All constitutional challenges are facial.

Occupy Boise's motion should be denied. The rules control both expressive and non-expressive conduct in designated public forums. No dispute thus exists that First Amendment time, place and manner restrictions apply. Beyond that point of agreement,

however, the organization's facial challenges go seriously astray.  The vagueness doctrine developed under the Fifth Amendment does not require the almost algebraic precision demanded by Occupy Boise, while the overbreadth doctrine requires that the challenged provision reach a "substantial" amount of potential First Amendment speech or assembly activity not otherwise subject to valid time, place and manner limitations.  The permitting system—which has application only to *reserving* use of the Jefferson Street Steps—complies fully with settled time, place and manner principles.  In sum, the organization's largely hypothetical- and case snippet-driven analysis founders on the stringent standards that govern facial challenges under the First and Fifth Amendments.

## ARGUMENT

## I.  APPLICABLE FACIAL CHALLENGE STANDARDS

Occupy Boise's constitutional challenge to the various rules is facial.  Dkt. 84-2 at 2 ("[a] facial challenge to the Rules is appropriate because the Rules, by their own terms, seek to regulate 'patently expressive or communicative conduct'").  It fails, however, to acknowledge the heavy burden imposed by that type of challenge.  The organization's silence undermines its entire substantive analysis by ignoring the critical role that facial challenge standards play here.

### A.  Facial Vagueness Challenge Standards

The "[v]agueness doctrine is an outgrowth not of the First Amendment, but of the Due Process Clause of the Fifth Amendment."  *United States v. Williams*, 553 U.S. 285, 304 (2008).  It is applied most commonly in a criminal context and will invalidate a conviction "if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages *seriously* discriminatory enforcement."  *Id.* (emphasis added); *see City of Chicago v. Morales*, 527 U.S. 41, 56 (1999) (same).

"But 'perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.'"  *Williams*, 553 U.S. at 304 (quoting *Ward v.*

*Rock Against Racism*, 491 U.S. 781, 794 (1989)).  As the Supreme Court observed in *Grayned v. City of Rockford*, 408 U.S. 104 (1972), "[c]ondemned to the use of words, we can never expect mathematical certainty from our language." *Id.* at 110; *accord Gospel Missions of Cal. v. City of Los Angeles*, 419 F.3d 1042, 1047 (9th Cir. 2005); *Cal. Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1149-50 (9th Cir. 2001). Impermissible vagueness thus exists when the predicate law is "vague 'not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all.'" *Morales*, 527 U.S. at 60 (quoting *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971)); *see also Williams*, 553 U.S. at 306 ("[w]hat renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact establishes has been proved, but rather the indeterminacy of precisely what that fact is"); *accord United States v Schales*, 546 F.3d 965, 973 (9th Cir. 2008).  The vagueness doctrine, unlike the overbreadth doctrine, accordingly does not implicate the rights of third parties; it instead asks the question in a facial challenge whether the particular statute or regulation imposes no "normative standard" that can be identified by a reasonable person.  *See Botosan v. Paul McNally Realty*, 216 F.3d 827, 836 (9th Cir. 2000) ("the [Americans With Disabilities Act] would be vague only if it is so indefinite in its terms that it fails to articulate comprehensible standards to which a person's conduct must conform").

### B.    Facial Overbreadth Challenge Standards

The Supreme Court often has had occasion to discuss the standards that govern facial challenges in the overbreadth context.  The recent decision in *United States v. Stevens*, 130 S. Ct. 1577 (2010), contains a concise summary of the overbreadth doctrine:

> To succeed in a typical facial attack, Stevens would have to establish "that no set of circumstances exists under which [the statute] would be valid," . . . or that the statute lacks any "plainly legitimate sweep[.]"   [¶] In the First Amendment context, however, this Court recognizes "a second type of facial

> challenge," whereby a law may be invalidated as overbroad if "a substantial
> number of its applications are unconstitutional, judged in relation to the statute's
> plainly legitimate sweep."

*Id.* at 1587 (citations omitted). The "substantial number" requirement reflects the "strong

medicine" (*Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973)) meted out by the

overbreadth doctrine's invocation.  The Court additionally has counseled that "[i]n

determining whether a law is facially invalid, we must be careful not to go beyond the

statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases."

*Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449-50 (2008); *see*

*also Los Angeles Police Dep't v. United Reporting Pub. Corp.*, 528 U.S. 32, 39 (1999)

(under the general prohibition against asserting third-party rights, "we face 'flesh and

blood' legal problems with data 'relevant and adequate to an informed judgment'")

(some internal quotation marks omitted); *Members of City Council v. Taxpayers for*

*Vincent*, 466 U.S. 789, 800 (1984) ("the mere fact that one can conceive of some

impermissible applications of a statute is not sufficient to render it susceptible to an

overbreadth challenge").

The reasons for caution where a party seeks application of the overbreadth

doctrine parallel those underlying the Supreme Court's reluctance to entertain facial

challenges more generally:

> Facial challenges are disfavored for several reasons.  Claims of facial
> invalidity often rest on speculation.  As a consequence, they raise the risk of
> "premature interpretation of statutes on the basis of factually barebones records."
> . . . Facial challenges also run contrary to the fundamental principle of judicial
> restraint that courts should neither "'anticipate a question of constitutional law in
> advance of the necessity of deciding it'" nor "'formulate a rule of constitutional
> law broader than is required by the precise facts to which it is to be applied.'" . . .
> Finally, facial challenges threaten to short circuit the democratic process by
> preventing laws embodying the will of the people from being implemented in a
> manner consistent with the Constitution.  We must keep in mind that "'[a] ruling
> of unconstitutionality frustrates the intent of the elected representatives of the
> people.'"

*Wash. State Grange*, 522 U.S. at 450 (citations omitted).  Thus, although there are "social

costs" attendant to persons declining to "undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation" and instead "choos[ing] simply to abstain from protected speech[,] . . . there are substantial social costs created by the overbreadth doctrine when it blocks application of a law to constitutionally unprotected speech, or especially to constitutionally unprotected conduct." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003). The "substantial number" requirement accommodates these competing social costs by ensuring "that a law's application to protected speech be "substantial," not only in an absolute sense, but also relative to the scope of the law's plainly legitimate applications . . . before applying the 'strong medicine' of overbreadth invalidation." *Id.* at 119-20. The *Hicks* Court further cautioned that "[r]arely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or conduct necessarily associated with speech (such as picketing or demonstrating)." *Id.* at 124. Overbreadth, in short, "is not casually employed." *Los Angeles Police Dep't*, 528 U.S. at 39.

## II. THE "RECREATIONAL USE" AND "PUBLIC BUSINESS" COMPONENTS OF THE "PUBLIC USE" DEFINITION ARE NOT IMPERMISSIBLY VAGUE

Occupy Boise contends that "[b]oth the 'recreational use' and 'public business' exceptions invalidate the Rules because of their vagueness." Dkt. 84-2 at 7. Those terms are part of the "Public Use" definition that is substantively common to both sets of the exterior rules:

> **Public Use.** Use that is not an Event, Private Event, Exhibit, Private Exhibit or use by a public officer, official, employee, contractor, agency, board or commission for state of Idaho business. Public Use includes, but is not limited to, the following:
> a.    The transit of individuals through the State Facilities unrelated to an Event or Exhibit;
> b.    Incidental, short-term recreational use of the State Facilities unrelated to an Event or Exhibit; and

      c.      The conduct of public business with any state of Idaho agency, board, commission, officer or elected official acting on behalf of the state of Idaho.

IDAPA 38.04.06.010.13; *see also id.* 38.04.08.010.10 (substituting "State Capitol Exterior" for "State Facilities").[1] Occupy Boise's vagueness challenge to recreational use component principally turns on the term's application in certain hypothetical situations posited during depositions; its challenge to the "public business" component is purely legal.

## A.    Recreational Use

Occupy Boise points to deposition testimony from two Department Facility Services' personnel who agreed that a picnic gathering would constitute recreational use but that "[w]hen pressed whether a group interested in a particular political movement could picnic on the grounds as a 'public use,' the [deponent] said he would have to ask an attorney to figure that out." Dkt. 84-2 at 8. The other deponent, "when asked how long a picnic could go on before it no longer qualified as a short-term recreational use, . . . did not have an answer at all." *Id.* The deponent actually responded that she could not "answer that" and "would ask legal counsel about, for the definition of 'short-term.'" Rice Dep. 66:21-22.

The term "recreation" is defined generally to include "refreshment of strength and spirits after work" and "a means of refreshment or diversion." *Merriam Webster's Collegiate Dictionary* 977 (10th ed. 1998) ("*Merriam Webster's*"). The term "short-term" is defined generally to mean "occurring over or involving a relatively short period

---

[1] The terms "Events" and "Exhibits" also are defined substantively identical in the exterior rules for "State Facilities" and the State Capitol. IDAPA 38.04.07.010.05 ("Event": "Any press conference, performance, ceremony, presentation, meeting, rally, reception, demonstration, protest, educational tour or gathering of people held at the State Facilities. As used in this definition, a gathering consists of two (2) or more people."); *id.* 38.04.06.010.08 ("Exhibit": "Any temporary Commemorative Installation and any attended or unattended display, including, but not limited to, equipment, machines, vehicles, products, samples, paintings, sculptures, arts and crafts, photographs, signs, banners or other graphic displays."); *see also id.* 38.04.08.010.05 ("Event" definition); *id.* 38.04.08.010.06 ("Exhibit" definition).

of time." *Id.* at 1085. The term "incident" has as its primary meaning "occurring or likely to occur esp. as a minor consequence or accompaniment." *Id.* at 587.

Taken together, these terms plainly capture a discrete type of conduct—brief uses of exterior property for personal respite without consequential impact on the property's use or physical integrity—*e.g.*, eating, sitting or talking. Those terms establish the requisite "normative standard" against which a reasonable person could assess whether his or her activity entails authorized recreational use. Even if some form of expressive activity arguably might be involved—*e.g.*, picketers taking a break from their activities to have lunch or play cards with their signs nearby—any potential question over whether this activity was "unrelated" to an ongoing Event would be rendered academic by, at the least, the "short-term" requirement. So, too, a Department employee's inability to identify an *absolute* durational limit for "short-term" does not establish impermissible vagueness because that determination would be made with reference to an understandable "normative standard." The recreational use component clearly satisfies the otherwise lenient adequate notice and enforcement standards imposed by the Due Process Clause of the Fourteenth Amendment in facial challenge context.[2]

---

[2] Occupy Boise's reliance on *City of Chicago v. Morales*, 527 U.S. 41 (1999), is misplaced. Dkt. 84-2 at 9. There, the Supreme Court invalidated on vagueness grounds an ordinance prohibiting "criminal gang members" for "loitering" in public places with one another or others—with the term "loitering" defined as "to remain in any one place with no apparent purpose." *Id.* at 47. What "doom[ed]" the provision, in the plurality's view, was "not the product of uncertainty about the normal meaning of 'loitering,' but rather about what loitering is covered by the ordinance and what is not"—*i.e.*, some forms of loitering were unlawful but others were not without an adequate standard for distinguishing between the permissible and impermissible. *Id.* at 57; *see id.* at 56-57 ("[i]t is difficult to imagine how any citizen of the city of Chicago standing in a public place with a group of people would know if he or she had an 'apparent purpose'"). Here, the modifiers "incidental" and "short-term" provide guidance not present in the ordinance. *Morales* is additionally inapposite because invalidation of the recreational use and public business components of the public use definition—in contrast to invalidation of the loitering prohibition—would not advance Occupy Boise's First Amendment interests because those uses would then become subject to the more stringent Event regulation.

**B.    Public Business**

This component of Public Use encompasses a likely small range of activity in which the exterior is used to carry out the "business" of government.  *See Merriam Webster's* at 154 (defining "business" as, *inter alia*, "particular field or endeavor").  The component's scope must be determined in large measure by what it is *not—i.e.*, "an Event, Private Event, Exhibit, Private Exhibit or use by a public officer, official, employee, contractor, agency, board or commission for state of Idaho business."  The provision accommodates, most importantly, the need for ingress to and egress from the Capitol Mall buildings by the public for the purpose of accessing the governmental services and officials.  Occupy Boise, lastly, cannot claim lack of adequate notice as to whether its activities—which indisputably fall within the scope of an Event or Exhibit—constitute public business.

The organization's effort to equate the "public business" component of "Public Use" with the resolution in *Board of Airport Commissioners v. Jews for Jesus, Inc.*, 482 U.S. 569 (1987), falls short because it ignores the substantiality of the resolution's impact on First Amendment conduct.  Dkt. 84-2 at 8.  There, the involved resolution forbade "any individual and/or entity seek[ing] to engage in First Amendment activities" within the airport's central terminal."  *Id.* at 571. The Court held the categorical ban could not "be justified even if [the airport] were a nonpublic forum because no conceivably governmental interest would justify such an absolute prohibition of speech." *Id.* at 575.   It rejected the commissioners' attempt to save the ban through an interpretation of the resolution that would exclude "airport related" expressive behavior, observing that "[m]uch nondisruptive speech-such as the wearing of a T-shirt or button that contains a political message-may not be 'airport related,' but is still protected speech even in a nonpublic forum" and that "this vague limiting construction would be to give [airport] officials alone the power to decide in the first instance whether a given activity is airport related."  *Id.* at 576.  Precisely the opposition situation exists here, since the

"public business" provision, construed consistently with its dictionary meaning and the expansive reach of the "Event," captures little, if any, expressive conduct and none that Boise Occupy has engaged in or established that it wishes to undertake—a fact that eliminates any specter of arbitrary enforcement that would affect the organization.

## III. THE RULES FACIALLY CHALLENGED ON OVERBREADTH GROUNDS WITHSTAND SCRUTINY UNDER APPLICABLE STANDARDS

Occupy Boise attacks various exterior rules on overbreadth grounds: (1) the seven-day duration limit (IDAPA 38.04.06.201, 38.04.08.201); (2) the daily closure period (*id.* 38.04.06.302.01, 38.04.06.302.02, 38.04.08.302.01.a); (3) the ground staking prohibition (*id.* 38.04.06.310.05, 38.04.08.310.05); (4) the surface marking prohibition (*id.* 38.04.06.310.08, 38.04.08.310.08); (5) the grounds maintenance and improvements interference prohibition (*id.* 38.04.06.301.04, 38.04.08.301.04); (6) the authority invested in state agencies and officials under the definition of the "State Events and Exhibits" definition (*id.* 38.04.06.010.15, 38.04.08.010.14) and to the Director to waive any restriction in the rules as to such events and exhibits (*id.* 38.04.06.203.03, 38.04.08.203.03); and (7) the Director's indemnification authority (*id.* 38.04.06.400.03, 38.04.08.500.03. Certain of these challenges proceed by way of extreme hypotheticals and others on the basis of possible negative impact on First Amendment rights. Regardless of the analytical approach employed, however, none of them persuasively identifies the substantial infringement on First Amendment rights under time, place and manner standards essential to a successful overbreadth challenge.[3]

### A.    Seven-Day Duration Limit

The rules restrict the duration of Events and Exhibits at a State Facility exterior or

---

[3] The State discussed the time, place and manner doctrine's basic requirements in the memorandum supporting its motion for partial summary judgment directed to 2012 Idaho Session Laws Chapter 17 (codified at Idaho Code §§ 67-1613 and -1613A). Dkt. 82-1 at 10-13. That discussion applies equally here and will not be repeated.

the State Capitol exterior to seven consecutive days and allow them to resume after a 24-hour period.[4]  The restriction prevents monopolization of the involved property's use by a particular individual or group.  Occupy Boise challenges the durational limit as insufficiently tailored and as leaving adequate alternatives.  Dkt. 84-2 at 13.  As to the first claimed defect, "it would be simple enough for the Rules to trigger durational limits only when another group wants to use the same space" and applies to all Events "even two-person gatherings and lone individuals with signs."  *Id.* at 14.  As to the latter, "[c]onsidering that the Idaho legislature typically meets for multiple months in a row each year, Idahoans will often have reasons for expressive activity near the Statehouse for more than seven days at a time—just as paid lobbyists do."  *Id.*

Occupy Boise's criticisms largely converge into the third time, place and manner consideration:  the availability of alternative channels of communication.  *Cf. Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1048 (9th Cir. 2006) ("[t]he question, then, is not whether *some* limitation of the ability of groups to engage in spontaneous expression at *some* locations in Santa Monica is valid, but whether the particular exception the City has crafted goes far enough in permitting outlets for expression when the usual two-day application deadline cannot be met").  Here, the duration restriction applies to a particular Event or Exhibit at a particular State Facilities location.  Nothing precludes an Event's organizers from moving their activities from that facility to another upon completion of the seven-day period.  So, for example, picketers could relocate from the Capitol Annex to the State Capitol exterior or another State

---

[4] In relevant part, IDAPA 38.04.06.201 provides:

> The duration of an Event or Exhibit shall not exceed seven (7) consecutive days, including time for set-up and clean-up.  An Event or Exhibit may continue to use the State Facilities after a seven (7) consecutive day period if the Event or Exhibit does not use the State Facilities after a seven (7) consecutive day period if the Event or Exhibit does not use the State Facilities for twenty-four (24) hours or more between each seven (7) consecutive day period.

IDAPA 38.04.08.201 is identical other than substituting "State Capitol Exterior" for "State Facilities."

Facilities' property during the one-day period; *i.e.*, the relocation establishes a new Event or Exhibit.  The duration's purpose is not to preclude the involved *activity* but to ensure that the *area* used by it is available for other Events, Exhibits, Public Use, or State Events and Exhibits.

The contention that the admittedly legitimate objective of avoiding property monopolization could be achieved by, *inter alia*, allowing an Event or Exhibit to continue, presumably indefinitely, until an alternative property use request is received parses the narrow tailoring element of the time, place and manner doctrine too finely.  To illustrate by reference to Occupy Boise's own activities, certain Events may discourage recreational use that, by its very nature, will be often unplanned or spontaneous.  *See Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 298 (1984) ("Damage to the parks as well as their partial inaccessibility to other members of the public can as easily result from camping by demonstrators as by nondemonstrators.  In neither case must the Government tolerate it.").  Whatever symbolic value may be attendant to "occupation" of a parcel of otherwise public property cannot justify imposing on the State the obligation, in essence, to establish a permitting scheme for Capitol Mall properties that have never been subject to such a requirement.  *See, e.g., United States v. Albertini*, 472 U.S. 675, 689 (1985) ("Nor are such regulations invalid simply because there is some imaginable alternative that might be less burdensome on speech. . . . Instead, an incidental burden on speech is no greater than is essential . . . so long as the neutral regulation promotes a substantial government interest that would be achieved less effectively absent the regulation."); *accord Menotti v. City of Seattle*, 409 F.3d 1113, 1137 (9th Cir. 2005).  The availability of nearby locations for the displaced activity additionally counsels against the reservation system advocated by Occupy Boise.[5]

---

[5] Occupy Boise's suggestion that "paid lobbyists" somehow are less affected by the durational limit than others finds no support in the exterior rules which apply no less to lobbyists—paid or not—than to the organization's members.  Nothing in the rules, moreover, affects the right of the members to lobby legislators in the same manner as "paid lobbyists."  Indeed, that right is

**B.**     **Hours Limitation**

**1.**     **Failure to Advance Significant State Interest.**   Occupy Boise hypothesizes that "[a]t 1:00 a.m., a group of thirty people could play Frisbee golf across the Capitol Mall[] under the Rules" but, "at that same time, three citizens gathering on the Capitol steps with signs are subject to being fined, ejected, and indefinitely banned from getting a permit to use the steps."   Dkt. 84-2 at 10 (footnotes omitted).   Although the first activity in theory may be subject to the recreational use component of the Public Use provision, the Department was not obliged by the narrow tailoring requirement either to anticipate or to draft to every conceivable contingency that may arise.   *E.g.*, *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989) ("the requirement of narrow tailoring is satisfied so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation") (internal quotation marks omitted).   The Capitol Mall is the administrative center of Idaho state government, composed of the Statehouse, various office buildings and related parking facilities. Dkt. 83 at ¶¶ 4, 5.   It contains no parks; all ordinary related landscape is integrated in the buildings' day-to-day purposes such as ingress, egress, employee or general public casual individual or group use for miscellaneous reasons including breaks or eating.   The Mall's physical configuration is not compatible with sporting events of the type postulated by Occupy Boise—particularly in the night if only because of limited lighting except at the Capitol building itself.   Dkt. 92-2 at ¶ 7.

---

protected explicitly by the "public business" component of the "Public Use" definition.  Equally, if not more, odd is its reliance on *Food Not Bombs* for the proposition that "[r]estrictions on groups smaller than 75 people are probably unconstitutional except in very small forums." Dkt. 84-2 at 14.   *Food Not Bombs*, however, addressed in relevant part the imposition of permitting requirements—precisely the logical result of Occupy Boise's actual conflict theory. *See* 450 F.3d at 1042 (in public open spaces, "[o]nly for quite large groups are these interests implicated, so imposing permitting requirements is permissible only as to those groups").  The decision additionally does not stand for the principle that Occupy Boise attributes to it, either on the cited internal page (*id.* at 1034), which deals with standing, or in that portion of the opinion actually relevant to the First Amendment treatment of groups based upon their size (*id.* at 1038-45).

Occupy Boise's reliance on *Grossman v. City of Portland*, 33 F.3d 1200 (9th Cir. 1993), mixes apples and oranges. Dkt. 84-2 at 10. The issue there was the validity of an ordinance provision that required a permit as a condition to, *inter alia*, "participat[ing] in any organized . . . demonstration[] or public address, or make any address, in a park." *Id.* at 1201. One member of a non-permitted group of picketers was cited for a violation. The Court of Appeals addressed the ordinance in the context of a 42 U.S.C. § 1983-predicated damages action subsequent to its repeal. The Court found it an impermissible infringement on free speech rights because "[b]oth the procedural hurdle of filling out and submitting a written application, and the temporal hurdle of waiting for the permit to be granted may discourage potential speakers"—except conceivably "in the case of large groups, where the burden placed on park facilities and the possibility of interference with other park users is more substantial." *Id.* at 1206. The ordinance, under these circumstances, was not "narrowly tailored to protect speech, as it should have been, it was tailored so as to preclude speech." *Id.* at 1207.

Here, aside from use of the Jefferson Street Steps, the challenged exterior rules contain no permitting requirement. *See supra* at 11 n.5. The rules, moreover, treat *all* forms of private conduct, regardless of its character, precisely the same with the exception of those activities constituting Public Use. The mere possibility that certain conduct properly deemed recreational use may take place during closure hours raises, at most, a question whether the Department should have precluded such use during those hours—a fine line-drawing assessment predicated on the nature of the likely-to-occur conduct, its practical significance, and its relationship to the security rationale underlying the closure period. That determination is committed to the agency. *See Clark*, 468 U.S. at 299 ("the time, place, or manner decisions assign to the judiciary the authority to replace the Park Service as the manager of the Nation's parks or endow the judiciary with the competence to judge how much protection of park lands is wise and how that level of conservation is to be attained").

2.     **Lack of Narrow Tailoring.**  Occupy Boise argues that "[t]he Rules'
suppression of all speech and assembly after hours . . . ignores that late night expressive
assemblies are traditional and historic."   Dkt. 84-2 at 11.   This contention does not
distinguish between "expressive assemblies" that may have been held on the Jefferson
Street Steps and those elsewhere in the Capitol Mall.   Aside from its own activities
between November 2011 and June 2012 at the Capitol Annex, Occupy Boise offers no
evidence that such activities have occurred on the Mall during the closure hours except
for the Jefferson Street Steps.   Security Manager April Rice's second declaration further
establishes not only the security challenges attendant to night time both in terms of video
access and available security personnel but also that, during her tenure, the incidence of
criminal or other activity implicating security concerns is disproportionately correlated to
hours of darkness and in areas other than the more-illuminated Steps.   Dkt. 92-2 ¶ 8.
There is simply no factual basis upon which to conclude that the closure period,
especially when measured against these otherwise legitimate security concerns, has a
substantial impact on expressive activities in areas other than the Jefferson Street Steps.

As to the Steps, the Capitol Building exterior rules provide Events and Exhibits
access for 18 hours each day. The issue, once again, turns on the extent to which the time,
place and manner doctrine authorizes judicial fine-tuning of state executive or legislative
branch determinations with respect to use of public property.   Here, the number of
security personnel is reduced during the evening hours, and individuals or groups have
the sidewalk abutting the Steps, or other external Capitol Mall sidewalks, that are not
subject to the hours' limitation.  *See* Dkt. 92-2 ¶ 7.[6]  Occupy Boise, given these facts,

---

[6] External sidewalks in the Capitol Mall are owned and subject to civil regulation by the Ada
County Highway District ("ACHD").   *See* Idaho Code §§ 40-1313, -1412, -2319; ACHD
Ordinance No. 190 (regulating use, maintenance and repair of sidewalks), *available at*
http://www.achdidaho.org/departments/TechServices/Docs/Ordinance_190.pdf; *see also* ACHD
Resolution No. 895 (adopting complete streets policy incorporated into section 3110 of the
ACHD policy manual), *available at* http://www.achdidaho.org/departments/PP/Docs/TLIP/
TLIP_cities_discussion_draft/Adopted_Docs/Complete_Streets_Policy_Resolution-895.pdf.  So,

fails to satisfy the requisite "substantial number" element of the overbreadth doctrine with respect to the Steps' closure period.

### C.    Staking And Chalking

Occupy Boise next contests the rules prohibiting the plunging of stakes into Capitol Mall grounds and those prohibiting the marking of the exterior of the State Facilities or State Capitol Exterior.  *See* IDAPA 38.04.08.310.08 (State Capitol Exterior); 38.04.06.310.08 (State Facilities).

**1.    Staking.**  Occupy Boise posits that the staking prohibition burdens "substantially more speech than is necessary to protect the grounds."  Dkt. 84-2 at 15.  It reasons that most stakes will not cause any harm and that "[s]o long as sprinkler heads are marked and avoided, only stakes that penetrate an entire foot into the ground could cause a problem."  *Id.*  Prohibiting users of state property from burying stakes in the ground is a permissible content-neutral (as it applies to all stakes, not just stakes depending on whatever speech a stake may be associated with), narrowly tailored means to promote the government's interest in, most importantly, protecting property.  *See* Dkt. 92-1 ¶ 2.b (Facilities Services manager's description of staking risks).  It is a fairly inconsequential limit on speech; it leaves open myriad other channels of communication. *See, e.g.*, *G.K. Ltd. Travel v. City of Lake Oswego*, 436 F.3d 1064, 1073-74 (9th Cir. 2006) (the narrowly-tailored factor merely demands "that the regulation actually advance the government's interest, but it need not do so in the least restrictive or intrusive way").

**2.    Chalking.**  The rules prohibit marking—using any sort of material or implement—on State Facilities or the Capitol Building.  It is clearly content-neutral as

---

for example, external sidewalks in the Capitol Mall have been the focus of recent downtown Boise construction activity to improve use by individuals with disabilities.  *See* http://www.achdidaho.org/projects/PublicProject.aspx?ProjectID=139  (project  description); http://www.achdidaho.org/Projects/Media/139/820_NE_Downtown_Ped.pdf  (interactive  map showing construction activity).  All Internet sites last were visited on January 5, 2013.

it applies to all marking, not just some marking.  Despite Occupy Boise's complaints that this provision is not narrowly tailored, a prohibition against marking up state buildings and property is entirely permissible.  The interest to be served is plainly the protection of public property and aesthetics.  Nowhere in First Amendment jurisprudence is it said that the government tolerate people marking up buildings and property—even if people wish to mark up public property with chalk.  Indeed, but one example of a no-chalking rule being seen as entirely reasonable is found in *Mahoney v. Doe*, 642 F.3d 1112 (D.C. Cir. 2011) (District of Columbia statute criminalizing defacement of public property by, among other means, marking, upheld in prosecution of man charged with violating said statute for using chalk on sidewalk; court observed that government's interest in aesthetics plainly served by prohibition).  It is also a fact that as benign as Occupy Boise portrays chalk when used to mark up state property, state resources have been expended to clean up chalked properties.  Dkt. 92-1 ¶ 7.  The inability of persons to mark up state properties does not preclude them from using signs or any of myriad other means to express whatever it is they wish to express.  *Occupy Minneapolis v. County of Hennepin*, 866 F. Supp. 2d 1062, 1070 (D. Minn. 2011).

> **D.    Grounds Maintenance And Improvements**

Occupy Boise complains that the ground maintenance rules (1) are not sufficiently tailored to accommodate expressive conduct and (2) do not sufficiently restrain the Director's discretion to determine when modifying the maintenance schedule.  Neither argument satisfies the burden that Occupy Boise must bear.

The rules provide that "State Maintenance and Improvements shall have priority over all other use of the State Facilities."  IDAPA 38.04.06.200.04, 38.04.08.200.04.  The rules similarly provide that a maintenance and improvement schedule will be published on the Department's Web site and may be modified according to several specified reasons.  *Id.* 38.04.06.302.04, 38.04.08.302.01.e.  Occupy Boise's complaint about the maintenance schedule is simply that it prioritizes maintenance and improvements—both

defined terms in the rules—over other public uses. The organization says, essentially, that because maintenance schedules theoretically could be rearranged or modified to allow expressive conduct, the prioritization of maintenance and improvements is not narrowly tailored to serve the interest in maintaining government property.

Aside from its wholly speculative nature that is a patently insufficient basis for a facial overbreadth challenge, this argument maintains that the prioritization of uses does not allow ample alternatives for Occupy Boise, or other individuals or entities, to engage in expressive activity. The prioritization of maintenance and improvements, however, simply establishes a method to *accommodate* potentially competing uses—and does so without regard to speech or speaker. Every limitation on expressive conduct reflects some degree of prioritization of one use over another. It is plain that the normal operation of the State Facilities and the Capitol Building to which the rules apply requires maintenance and improvement of those properties. As this Court recognized in its Memorandum Decision and Order on the defendant's motion to modify or clarify the Court's prior injunction, "regular maintenance and repair of state property is a substantial governmental interest" (Dkt. 53 at 8 (citing *Clark*, 468 U.S. at 293)) and "[t]he State, no less than a private owner of property, has the power to preserve the property under its control for the use to which it is lawfully dedicated" (*id.* at 8-9 (quoting *Adderly v. Florida*, 385 U.S. 39, 48 (1967)).

Any limitation on expressive conduct that prioritizing maintenance causes is sufficiently narrow to satisfy First Amendment scrutiny. If maintenance activities are occurring, or if improvements to State Facilities or the Capitol Building need to be made, the rules simply reflect that the Department may proceed with those activities. This is no different than, to illustrate, a limitation on parades on busy city streets during rush-hour, or the unavailability of a park for First Amendment activities due to a maintenance need. Nothing in any case Occupy Boise has provided indicates that maintenance may never have priority over other uses. Maintenance hardly occurs *all the time* in a fashion that

cannot be accommodated with other uses, and there is no suggestion that the temporary limitation on expressive conduct does not allow ample alternatives even when accommodation at a particular locality is not feasible. Occupy Boise itself indicates that competing uses "rarely compete" (Dkt. 84-2 at 18) and so seems to concede that the prioritization of uses is but a minimal limitation on expressive activity.

Occupy Boise's contention that the determination whether to modify the maintenance schedule gives the Director constitutionally insufficient unbridled discretion should similarly be rejected. First, the claim that "[t]he State's whim in modifying the maintenance schedule is *unlimited* by the rules" is factually wrong. The rules specifically state that the schedule may be modified due to weather, staffing, emergency repairs, equipment failures, funding changes, contract modifications, State Events, and Exhibits or other causes arising after the schedule's publication. IDAPA 38.04.06.302.04, 38.04.08.302.01.e. This reflects a basic reality facing those running an enterprise that sometimes scheduled matters must yield to intervening events. This provision is therefore unlike a provision in the principal case Occupy Boise cites allowing an official to revoke a permit allowing expressive conduct at any time for any reason. *See Kaahumanu v. Hawaii*, 682 F.3d 789 (9th Cir. 2012). The evils associated with standardless discretion simply do not exist here.

### E. State Events

Occupy Boise also contends that the rules are invalid because "[n]o standards . . . guide the Director's whim in selecting State-sponsored events, and no record is required to be made for judicial review." The problem with this argument is twofold. First, nothing in the rules gives the Director the sort of unbridled discretion in selecting certain events for State sponsorship and not selecting others. A State Event is a "function[] initiated and controlled by any state of Idaho agency, board, commission, officer or elected official acting on behalf of the state of Idaho." IDAPA 38.04.06.010.15,

38.04.08.010.14.  Nothing in any rule contemplates the sort of State-sponsorship that the Occupy Boise imagines.

The insubstantiality of Occupy Boise's facial challenge becomes evident through an examination of the predicate State Event for its challenge: the Department's sponsorship of the Fallen Soldier commemoration on September 11, 2012, Dkt. 84-2 at 19 & nn. 63-65.  An integral, indeed essential, element of the commemoration was the addition of the newly fallen soldiers' names to the memorial, with the additions individually covered and then uncovered by Idaho Army and Air Force National Guard members during the commemoration as the names, together with dates and locations of death, were read by the Governor or the First Lady—modifications to a Commemorative Installation (IDAPA 38.04.06.010.04) that could be made only by the Department or at its direction.  Dkt. 92-1 ¶ 6; *see* IDAPA 38.04.06.310.05.  Under these circumstances, the Director's determination to assume responsibility for the commemoration as a State Event fell specifically within the term's definition in IDAPA 38.04.06.010.15 because a core "function" of the event—the Commemorative Installation's modifications—was "initiated and controlled by" the Department.  The Court should therefore reject Occupy Boise's challenge to the State Events provision.

### F.    Indemnification

Occupy Boise contends the provisions in the rules about indemnification are too broad to withstand scrutiny.  Dkt. 84-2 at 20.  The indemnification provisions provide in part:

> Individuals, entities, and organizations using the State Capitol Exterior are responsible and liable for all suits, damages, claims or liabilities arising from use of the State Capitol Exterior.  The state of Idaho shall have no liability for injury to private property, including posters, placards, banners, signs, equipment, tables, materials, and displays on the State Capitol Exterior.

> Any individual, entity or organization permitted to use the State Capitol Exterior is deemed to agree to indemnify the state of Idaho from and against all claims, demands, actions, or causes of action, together with any and all losses, costs or

related expenses asserted by any group or persons for bodily injury or damage to property arising out of or in any way connected with the use of the State Capitol Exterior.

IDAPA 38.04.08.500.01, .03; *see also id.* 38.04.06.400.01, .03 (interior rules); *id.* 38.04.08.500.01, .03 (State Capitol exterior rules). These provisions are not unconstitutionally broad.

In *Kaahumanu*, the Ninth Circuit upheld the validity of a provision requiring a permittee to indemnify and hold the state harmless only for acts or omissions by the permit applicant, failures by the applicant to maintain the premises, and claims made by reason of the applicant's failure to follow the permit's terms and conditions. 682 F.3d at 810. This was, the court said, in contrast to the provision in *Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1038-39 (9th Cir. 2009), which

required permittees to indemnify and hold the city harmless not only for harm caused by third parties reacting to the expressive activity of the permittees, but also for harm caused by the city to the permittees, and harm "caused by the conduct of the event" to third parties, when "conduct" included actions by the city or other parties unrelated to the permittees.

682 F.3d at 809. The distinction drawn in *Kaahumanu* controls here.

The indemnification provisions in this case are not as broad as Occupy Boise thinks they are. Liability extends only to individuals, entities, and organizations using the State Capitol Exterior and State Facilities for claims arising from their use—not any use—of the grounds. In other words, users of the grounds are liable for their actions, not the actions of third parties. Similarly, individuals, entities, and organizations are deemed to indemnify the state of Idaho for claims by others arising from the liable party's conduct. Just like the liability provision, the indemnification provision extends only to the *user* whose acts or omissions cause harm or injury. The indemnification provision does not, by contrast, require users to indemnify the state of Idaho for claims unrelated to the particular user's conduct. This makes these provisions more like those upheld in

*Kaahumanu* than those rejected as unconstitutional in *Long Beach Area Peace Network*. The Court should reject Occupy Boise's challenge to them.

## IV.  THE JEFFERSON STREET STEPS' RESERVATION PROVISIONS SATISFY PERMIT-RELATED TIME, MANNER AND PLACE REQUIREMENTS ON THEIR FACE

Occupy Boise challenges the rules allowing persons to reserve space on the Jefferson Street Steps as not narrowly tailored in certain respects.  It tees up five reasons why these rules should be found invalid, but each lands in the rough.

First, the organization contends that the first-come, first-served system is flawed because of all the uncertainty about the size of groups and who was there first.  This is an imagined harm.  A permit for the Jefferson Street Steps "grants a reservation providing priority for use of the area specified in the permit."  IDAPA 38.04.08.400.01.  A permit is not required to use the Steps.  *Id.*  Permits are issued on a first-come, first-served basis without regard to speaker or message.  *Id.* 38.04.08.400.05.  There is no fee. *Id.* 38.04.08.400.07.  There are no limitations on the number of permits that will issue for a given period.  Occupy Boise charges that these requirements are not narrowly tailored because an Event can include a group as small as two people and an Exhibit can be as small as consisting of one thing.  Dkt. 84-2 at 21.  It complains that the Steps are extensive enough to hold many small gatherings and signs, but exactly how the permit system reserving space for a group of whatever size is not disclosed.  The permit system granting priority of use to an applicant while at the same time freely allowing non-permitted use to the extent public safety is not compromised in no way offends the First Amendment, and Occupy Boise has failed to show otherwise.

Second, Occupy Boise also takes aim at the bases for which a permit may be denied (Dkt. 84-2 at 21), arguing that they lack a necessary element of actual imminent harm.  Occupy Boise misreads the rules.  The rules identify five bases for which a permit will be denied:

> *If the use would cause a clear and present danger* to the orderly process of state

of Idaho government or to the use of the State Capitol Exterior due to advocacy of:

i.      The violent overthrow of the government of the United States, the state of Idaho, or any political subdivision thereof;

ii.     The willful damage or destruction, or seizure and subversion of public property;

iii.    The forcible disruption or impairment of or interference with the regularly schedule[d] functions of the state of Idaho;

iv.     The physical harm, coercion, intimidation or other invasions of the lawful rights of public officials or the public; or

v.      Other disorders of a violent crime.

IDAPA 38.04.08.401.02.i (emphasis added). So the requested use must do two things: (1) "cause a clear and present danger to the orderly process" of government or use of the building, *due to* (2) any one of the five bases. The organization complains that there is no required caveat that there be a "reasonable apprehension of imminent danger to the essential functions and purposes of the institution" (Dkt. 84-2 at 22), but its ignores that a clear and present danger to the orderly process of state government and the use of the Capitol *is in fact* a prerequisite for denying a permit. The rules are, then, by their own words, "narrowly drafted so as to suppress only that speech which presents a clear and present danger." *Stacy v. Williams*, 306 F. Supp. 963, 971 (N.D. Miss. 1969).

Third, Occupy Boise targets the rules for their allowance to the Director to revoke a permit, saying that they lack adequate standards to guide her discretion. Dkt. 84-2 at 22. But just as the Director's ability to modify ground maintenance schedules did not contain the sort of anytime, any reason discretion held constitutionally infirm in *Kaahumanu*, neither do the rules for revoking permits contain that sort of discretion. Permits may be revoked for the violation of any term of the permit or any violation of law or the use rules. IDAPA 38.04.08.402. It is true that the Director may impose conditions on a permit—but only ones that serve the purpose of "protecting persons and property." IDAPA 38.04.08.400.08. Protecting persons and property is the general criteria for imposing conditions; they inform and guide the formulation of conditions, and it is likely that conditions would be more specific than that. A revocation based on a

specific condition would not simply be because conduct violated a general "protection of persons or property" standard. It would be based on a more specific condition derived from that general standard. Thus, permits will not be revoked on the overly general, standardless bases like the Ninth Circuit was faced with, and struck down, in *Seattle Affiliate v. City of Seattle*, 550 F.3d 788 (9th Cir. 2008). There, the chief of police could move marchers onto sidewalks and off of streets only "in the interest of vehicular or pedestrian safety." 550 F.3d at 799. The Court agreed that the discretion of the police to move marchers "in the interest of" safety was too broad. *Id.* at 800.

The Court in *Seattle Affiliate* contrasted the Seattle provision with similar provisions in other cases, where the ordinances or statutes were upheld: A city could deny a permit to use a park in *Thomas v. Chicago Park District*, 534 U.S. 316 (2002), where the activity "would present an unreasonable danger to the health or safety" of the public or park employees; a statute instructing a municipality to license a march, provided "the convenience of the public in the use of the streets would not thereby be unduly disturbed" was upheld in *Cox v. New Hampshire*, 312 U.S. 569 (1941); the Ninth Circuit upheld a statute giving officials discretion to "restrict[ ] events to city sidewalks, portions of a city street, or other public right-of-way," but only when those restrictions were "necessary to . . . protect the safety of persons and to control vehicular and pedestrian traffic" in *Long Beach Area Peace Network*, 574 F.3d at 1039; and in *NAACP, Western Region v. City of Richmond*, 743 F.3d 1346 (9th Cir. 1984), the Court upheld a statute that required approval of a parade permit unless the parade would place an "undue burden upon the movement of vehicular traffic."

Fourth, Boise Occupy attacks the permitting system as not providing the kind of written reasons for denials that they contend must exist as part of any lawful permitting scheme. Dkt. 84-2 at 23. It should be remembered, though, that the permit system here are not akin to grants of permission that must be obtained before an individual or group can engage in expressive conduct on the Jefferson Street Steps. The system in place is a

*reservation* system designed to manage a finite resource—space—among potentially competing uses in a content-neutral fashion. *See Thomas*, 534 U.S. at 322-23 (permit scheme regulating competing uses of space on a content-neutral basis "differs *toto coelo*" from a traditional censorship regime).

Equally significant is the fact that permit denials are subject to contested case proceedings under the Idaho Administrative Procedure Act ("IAPA"), Idaho Code §§ 67-5701 to -5792.[7]  The state administrative procedure act requires decisions to be in writing and provide a reasoned explanation for the decision.  *See id.* § 67-5248.  If a denial or a permit's conditions or a revocation is not in writing, it would run afoul of the IAPA's requirements.  Thus there is a legal safeguard in place to effectively ensure that conditions, denials, and revocations will be in writing and thus satisfy the requirement that decisions be in writing to facilitate judicial review.

Finally, Occupy Boise argues that the State is powerless to charge permit holders for the costs of cleaning up their trash or necessary security services.  It goes so far as to claim that these are content-based limitations on speech because the Department must "necessarily examine the content of the message that is conveyed in order to assess the costs."  Dkt. 84-2 at 24.  This seems strange, and unsurprisingly Occupy Boise provides no example of how collecting trash associated with an Event is a content-based restriction on speech.

Regardless, the fees for things like trash collection, janitorial services, and security services are legitimate components of a permit scheme.  The Idaho rule is unlike in the fee provisions in *Forsyth County v. Nationalist Movement*, 505 U.S. 123 (1992), where the administrator could decide the kind and amount of charges, apparently without being limited to charging *direct* costs.  The provision here limits the discretion of the

---

[7] It is worth a mention that Occupy Boise claims that permits may be denied without explanation, but that is patently wrong:  Denials are in writing (IDAPA 38.04.08.403.01.a) and, presumably, so are conditions and revocations.

Department to charge the "direct costs" of trash collection, janitorial services, and security services. It is impossible to identify all classes of government-provided services that may be necessitated by an event or exhibit, but the key is the limitation for the *direct costs* for those services. Direct costs plainly refer to the source (the permittee, not the audience), kind, and amount. There is no opportunity in the rules for the Department to assess a fee based on the content of the Event or Exhibit. As these conditions are part of a permit subject to judicial review under IAPA, a ready remedy exists for erroneous or improper costs. Occupy Boise overlooks, too, that there is a straightforward alternative should it not wish to be subject to the fees that may be imposed. Again, the permit system here is simply a reservation of space—it is not a prerequisite to exercising First Amendment rights. Therefore, the fee provisions, which do not apply depending on content, leave open ample alternatives for expression of conduct on the Jefferson Street Steps and elsewhere. Occupy Boise's facial challenge fails.

## CONCLUSION

Occupy Boise's motion for partial summary judgment should be denied.

DATED this 14th day of January 2013.

<div style="margin-left:40%">

STATE OF IDAHO
OFFICE OF THE ATTORNEY GENERAL

By____/s/ *Clay R. Smith*_____
      Clay R. Smith

By____/s/ *Carl J. Withroe*_____
      Carl J. Withroe
      Deputy Attorneys General

</div>

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 14th day of January 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following person:

Bryan K. Walker
Walkeresq.bk@gmail.com

Tom Perry
tom.perry@gov.idaho.gov

Richard A. Eppink
reppink@acluidaho.org

<div align="right">

  /s/ *Clay R. Smith*        
Clay R. Smith
Deputy Attorney General

</div>