UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| EDWARD WATTERS, DEAN GUNDERSON, STEVEN FARNWORTH, MATTHEW ALEXANDER NEWIRTH, individuals, and OCCUPY BOISE, an Idaho unincorporated nonprofit association,<br><br><br><br>      Plaintiffs,<br><br>      v.<br><br>C.L. (BUTCH) OTTER, in his official capacity as the Governor of the State ofIdaho, TERESA LUNA, in her official capacity of the Director of the Idaho Department of Administration, and COL. G. JERRY RUSSELL, in his official capacity as the Director of the Idaho State Police,<br><br>      Defendants. | Case No. 1:12-cv-001-BLW<br><br>MEMORANDUM DECISION AND ORDER |

**INTRODUCTION**

The Court has before it Occupy Boise's renewed motion for partial summary

judgment (Dkt. 106), challenging administrative rules that Occupy Boise claims restrict

First Amendment activity.  The Court heard oral argument on Occupy Boise's renewed or supplemental motion for partial summary judgment on July 23, 2013.  It had heard oral argument on Occupy Boise's first motion for partial summary judgment on February 26, 2013.[1]  The Court took the motions under advisement.  For the reasons set forth below the Court will grant in part and deny in part Occupy Boise's renewed motion for partial summary judgment.

## SUMMARY

After Occupy Boise filed its complaint challenging a newly-enacted statute banning camping on state grounds, the State imposed administrative regulations governing use of the Capitol Mall exterior.  Occupy Boise claims that the administrative rules impermissibly restrict First Amendment activity, and it now seeks partial summary judgment declaring the rules invalid and permanently enjoining their enforcement.

The administrative rules challenged by Occupy Boise regulate, in part, expressive conduct operating at the core of the First Amendment: political speech taking place in a traditional public forum – the Statehouse and Capitol Mall area.  Regulations affecting political speech in traditional public fora are presumptively invalid. But the First Amendment does not guarantee the right to communicate one's views at all times and all

---

[1] The Court found Occupy Boise's first motion for partial summary judgment to be moot. The Court, however, considers in this decision the arguments Occupy Boise incorporated into its supplemental motion for partial summary judgment.  In addition, the Court considers in this decision whether Occupy Boise's challenge to the 2012 rules is moot.

places, or in any manner desired. The State has the authority to impose reasonable time, place, and manner restrictions, provided they (1) are content neutral, (2) are narrowly tailored to serve a significant governmental interest, and (3) leave open ample alternative channels of communication.  In addition, a permitting scheme may not give unbridled discretion to a government official.

Some of the challenged rules meet this criteria while others do not.  The chalking, staking, and grounds maintenance rules are all sufficiently tailored to further a significant state interest and are therefore reasonable time, place, and manner restrictions. In addition, the permitting scheme, for the most part, as well as the rules pertaining to utility services, also pass constitutional muster.  On the other hand, the rules allowing rule waivers for "State Events" impermissibly elevates state-sponsored speech over other types of speech and grants the Idaho Department of Administration too much discretion in deciding which events are "State Events."  The fees and costs rule also grants the Department too much discretion in imposing costs on permit holders.  Finally, the revised durational limits and the indemnity and liability rules are not sufficiently tailored to serve a legitimate state interest and are therefore invalid.

## BACKGROUND

In November 2011, Occupy Boise, in solidarity with the Occupy Wall Street movement, erected a tent city on the Capitol Annex grounds to protest income inequality. Occupy Boise placed the tent city on a public plaza in direct view of the Idaho Statehouse, the Idaho Supreme Court building, and other nearby government buildings.

Memorandum Decision and Order - 3

As part of their protest, Occupy Boise participants camped on the Annex grounds round-the-clock.

After Governor Otter signed into law a ban on "camping" on state grounds, he signed into law a statute, Idaho Code § 67-5709, directing the Idaho Department of Administration to promulgate new rules governing the use of the Capitol Mall grounds and other state facilities. I.C. § 67-5709.   In the spring of 2012, Defendant Teresa Luna and the Department of Administration issued temporary rules pursuant to the statute.  The temporary rules went into effect on April 17, 2012.  The rules were amended effective May 14, 2012, and were later rescinded on October 3, 2012, with new temporary and proposed rules simultaneously issued.

The rules, found in the Idaho Administrative Code at IDAPA 38.04.06 and 38.04.08, cover two sets of grounds near the Statehouse: IDAPA 38.04.06 covers the grounds in the Capitol Mall except for the two blocks where the Statehouse itself sits, as well as "Other State Properties," which includes state facilities located throughout Boise and other parts of Idaho; and IDAPA 38.04.08 covers the grounds around the Statehouse itself, including the prominent south Capitol steps on Jefferson Street.

Both sets of grounds contain several public open spaces that can accommodate large groups of people or many individuals not in a group. *Howard Decl.*, Ex. C, Dkts. 84-14 and 84-15; *Watters Decl.*, Ex. A, Dkt. 84-8.  By the rules themselves, the State has acknowledged these grounds as forums for First Amendment expression, association, and assembly. These grounds have also traditionally been used for those activities. *Watters*

Memorandum Decision and Order - 4

*Decl.* ¶ 4, Dkt. 84-7; *Neiwirth Decl.* ¶ 5, Dkt. 5; *Gunderson Decl.* ¶¶ 6-7, Dkt. 4; *Perry Decl.* ¶ 2, Dkt. 9.

Having already filed a complaint challenging the constitutionality of the no-camping ban, [2] in September 2012, Occupy Boise moved to amend its complaint to include a challenge to some of the newly-enacted administrative rules. Occupy Boise then filed a motion for partial summary judgment in December 2012, asking the Court to declare the temporary rules, as published in the October 2012 edition of the Idaho Administrative Bulletin, unconstitutional and enjoining their enforcement.

On February 26, 2013, the Court held oral argument on Occupy Boise's motion for partial summary judgment and took the matter under advisement.  The following day, February 27, 2013, the Idaho Legislature printed two concurrent resolutions, each proposing to reject parts of the new rules as "not consistent with legislative intent . . . ." The Legislature adopted both concurrent resolutions, rejecting parts of both sets of new rules, on about March 29, 2013. In response to the Legislature's resolutions, Defendant Teresa Luna and the Idaho Department amended the rules.  The amendments took effect immediately, on April 5, 2013.

---

[2] On February 26, 2012, this Court issued a preliminary injunction enjoining the State from removing the symbolic tent city and allowing Occupy Boise to staff the site around the clock.  The Court, however, did not enjoin the ban on overnight sleeping, or the ban on personal belongings related to camping, along with cooking and fire-building materials.

Occupy Boise has now filed a supplemental motion for partial summary judgment. In its supplemental motion, Occupy Boise renews some prior arguments still applicable to some unmodified provisions and mounts a First Amendment attack on three modifications in the revised rules –  Public Use Duration; Approvals and Denials of a Permit Application; and Liability and Indemnification  – and two other provisions that were not substantively altered by the revisions pertaining to Utility Service. In addition, Occupy Boise argues that its earlier challenge to certain deleted rules remains justiciable under the unilateral action and collateral consequences exceptions to the mootness doctrine.[3]

## ANALYSIS

### 1.  First Amendment Framework

Certain general principles of First Amendment law guide the Court's analysis. The First Amendment prohibits Congress from enacting laws "abridging  the freedom of speech, ... or the right of the people peaceably to assemble." U.S. Const. amend. I. The

_____

[3] Occupy Boise also filed an "Amended First Motion for Partial Summary Judgment" (Dkt. 116). Occupy Boise apparently filed this motion in response to a footnote in the Court's Memorandum Decision and Order dated June 26, 2013, which granted partial summary judgment to the State with respect to the validity of the no-camping ban.  In the footnote, the Court mooted Occupy Boise's first motion for partial summary judgment (Dkt. 84), and Occupy Boise now fears that the Court's footnote disposed of Occupy Boise's argument that its challenges to the 2012 rules – even those that have been repealed or revised – are not moot.  However, the Court reads Occupy Boise's supplemental motion as both explicitly, in some cases, and implicitly, in other cases, incorporating Occupy Boise's arguments from its first motion for partial summary judgment.  To clarify, the Court did not intend to dispose of Occupy Boise's arguments pertaining to the 2012 rules.  It therefore addresses Occupy Boise's mootness arguments in this decision.

Supreme Court has extended the protection of the First Amendment to the states. *Edwards v. South Carolina*, 372 U.S. 229, 235 (1963).

The First Amendment affords greater protection to certain types of speech. *See, e.g., Nat'l Adver. Co. v. City of Orange*, 861 F.2d 246, 248 (9th Cir. 1988) ( "The first amendment affords greater protection to noncommercial than to commercial expression.").  Political speech is core First Amendment speech, critical to the functioning of our democratic system. *Carey v. Brown*, 447 U.S. 455, 467 (1980).  And "the practice of persons sharing common views banding together to achieve a common end is deeply embedded in the American political process." *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 907(1982) (quoting *Citizens Against Rent Control/Coal. for Fair Hous. v. City of Berkeley*, 454 U.S. 290, 294 (1981)).  For this reason, the First Amendment applies with particular force to marches and other protest activities. *U.S. v. Baugh*, 187 F.3d 1037, 1042 (9th Cir. 1999)

The Supreme Court also affords different protections to First Amendment activities depending on the location of the activities.  To account for these differences, the Court has developed an analysis that examines the location of the speech to determine the level of scrutiny the courts must give to any state-imposed restrictions on that speech. According to this analysis, the restrictions on speech in a traditional public forum are examined under the strictest scrutiny. *United States v. Kokinda*, 497 U.S. 720 (1990).  In a public forum, the state may not impose a blanket prohibition on speech, and may enforce a content-based exclusion only if it is narrowly drawn to achieve a compelling

state interest. *A.C.L.U. of Nevada v. City of Las* Vegas, 333 F.3d 1092 (9th Cir. 2003). On the other hand, the state may enforce time, place, and manner restrictions that are content-neutral, narrowly tailored to serve a significant government interest, and leave open alternative channels of communication. *Id.*

A law will be held facially invalid under the First Amendment if it "sweeps too broadly, penalizing a substantial amount of speech that is constitutionally protected." *Forsyth Cnty. v. Nationalist Movement,* 505 U.S. 123, 130 (1992). "When the Government restricts speech or other First Amendment rights, the Government bears the burden of proving the constitutionality of its actions." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000).

## 2. Challenge to 2013 Rules

Occupy Boise maintains that the administrative rules recently adopted by the Department of Administration pursuant to section 67-5709 impermissibly limit expressive activity, assembly, and association on the grounds around Idaho's Capitol building.  Occupy Boise seeks partial summary judgment declaring the rules invalid and permanently enjoining their enforcement.

First, Occupy Boise renews its prior arguments for the following components of the 2013 Rules: (1) the rules against staking; (2) the rules against chalking; (3) the maintenances rules; (4) "State Event" rules; (5) the "first come, first used" rule; (6) the rules regulating permit denials; and (7) the rules allowing the State to impose costs, to revoke permits, and impose conditions on permits.

Second, Occupy Boise argues that the 2013 amendments fail to fix the problems with the 2012 rules with respect to the (1) durational limits on First Amendment activities, (2) the procedure for denying permits, and (3) the indemnity and liability rules. Also, Occupy Boise claims that the provisions governing the use of power outlets are unconstitutional because they give the Director of the Department of Administration "unbridled discretion to grant electrical use only to the group she likes." *Occupy Boise's Opening Brief* at 4, Dkt. 106-1.

### A. *The Challenged Rules Regulate, In Part, Expressive Conduct Taking Place in a "Traditional" Public Forum.*

The rules Occupy Boise challenges here regulate, in part, expressive conduct protected under the First Amendment. Indeed, much of the expressive conduct the rules target is core First Amendment speech: political speech and gatherings like protest assemblies, as well as any graphic display, which encompasses political signs.  The rules also extend to regulation of marches on the Capitol Mall and around the Statehouse.  This type of speech lies at the heart of our democratic process and "operates at the core of the First Amendment." *Boos v. Barry*, 485 U.S. 312, 318 (1988). The First Amendment therefore applies with particular force to these types of activities. *United States v. Baugh*, 187 F.3d 1037, 1042 (9th Cir. 1999).

The challenged rules must also be examined under the strictest scrutiny because they regulate expressive conduct taking place in a traditional public forum – the Statehouse and the Capitol Mall area, which are both the operative and symbolic seats of

Idaho State government.  Assembling and expressing grievances "at the site of the State Government" is the "most pristine and classic form" of exercising First Amendment freedoms. *Edwards v. South Carolina*, 372 U.S. 229, 235 (1963). In such "quintessential public forums," the State's ability to limit expressive activity is "sharply circumscribed." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983).

The First Amendment, however, "does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. International Soc. for Krishna Consciousness, Inc.* 452 U.S. 640, 647 (1981).  As already noted, even for political speech occurring in a public forum, the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the (1) restrictions are justified without reference to the content of the regulated speech, (2) they are narrowly tailored to serve a significant governmental interest, and (3) they leave open ample alternative channels for communication of the information. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (internal quotation marks omitted).

### B.  *The Chalking Rules, Staking Rules, and Grounds Maintenance Rules Are Sufficiently Tailored to Advance a Significant State Interest.*

Occupy Boise attacks various exterior rules on overbreadth grounds, arguing that the challenged rules are not narrowly tailored to advance a substantial government interest: (1) the chalking prohibition,  IDAPA 38.04.06.310.08, 38.04.08.310.08; (2) the ground staking prohibition, id. 38.04.06.310.05, 38.04.08.310.05; and (3) the grounds

maintenance and improvements interference prohibition, id. 38.04.06.301.04, 38.04.08.301.04.

### (1) The rules against chalking

Occupy Boise argues that the rules against chalking are superfluous, as sidewalk easily washes off and does no harm to Capitol grounds.

First, the no-chalking rules are content neutral.  The rules prohibit certain conduct, including certain expressive conduct, without reference to the message the speaker wishes to convey. IDAPA 38.04.06.310.08, 38.04.08.310.08,  Nor is there any evidence in the record the State adopted the rules "because of [agreement or] disagreement with the message" a speaker may convey. *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

Second, the State's interest in controlling the aesthetic appearance of state facilities, especially the Capitol Mall grounds, is substantial. In *City Council of Los Angeles v. Taxpayers for Vincent*, the Supreme Court upheld a Los Angeles ordinance regulating the posting of signs on public light posts. 466 U.S. 789, 806 (1984). In upholding the ordinance, the Court stated that "municipalities have a weighty, essentially esthetic interest in proscribing intrusive and unpleasant formats for expression." *Id.*

The no-chalking rule is also sufficiently tailored to serve the State's aesthetic interest. It is the tangible medium—chalking—that creates the very problem the rule seeks to remedy. The Court reached a similar conclusion in *Taxpayers for Vincent*, noting "the substantive evil—visual blight—is not merely a possible by-product of [posting

signs], but is created by the medium of expression itself." 466 U.S. at 810.  Without question, the rules encompass some expressive activity. But "when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *United States v. O'Brien*, 391 U.S. 367, 376–77 (1968).

It is true chalking is temporary and can be cured. But so was the defacement at issue in *Taxpayers for Vincent*. The government can proscribe even temporary blight. 466 U.S. at 810.

Finally, the prohibition against chalking leaves Occupy Boise with alternative channels of communication. *Heffron,* 452 U.S. at 655.  Nothing prevents Occupy Boise, or any other individual or group, from possessing signs and banners while conducting an assembly on state-owned grounds. Thus, ample alternative channels of communication exist.

Occupy maintains, however,  that the rule should be struck as unconstitutional because the "State offers no reason why the rule that groups clean up after themselves is not adequate to advance its interests." While a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests, "it need not be the least restrictive or least intrusive means of doing so. *Ward v. Rock Against Racism*, 491 U.S. 781, 798-799 (1989). Rather, the requirement of narrow tailoring is satisfied "so long as the ... regulation promotes a substantial

government interest that would be achieved less effectively absent the regulation." *Id.* at

799.  In other words, "[s]o long as the means chosen are not substantially broader than

necessary to achieve the government's interest…, the regulation will not be invalid

simply because a court concludes that the government's interest could be adequately

served by some less-speech-restrictive alternative." *Id.* at 800. "The validity of [time,

place, or manner] regulations does not turn on a judge's agreement with the responsible

decisionmaker concerning the most appropriate method for promoting significant

government interests or the degree to which those interests should be promoted." *Id.*

(internal quotation marks omitted).

In sum, the no-chalking rules are content neutral, and substantially justified by the

State's aesthetic interest in combating the very problem chalking entails—the defacement

of public property. Because the rules do not curtail the means of expression altogether,

and allows individuals and groups like Occupy Boise to express themselves in other

ways, the no-chalking rules are not unconstitutional.

### (2) The rules against staking

Likewise, the rules against staking are constitutional.  Like the no-chalking rules,

the no-staking rules are content neutral and are narrowly tailored to advance the State's

significant interest in controlling the aesthetic appearance of state grounds surrounding

the Capitol and other state buildings.  Finally, the prohibition against staking leaves

Occupy Boise with alternative channels of communication.  The rules do not prohibit the

possession of signs or banners – they just prohibit staking those signs or banners on state property.

Occupy Boise argues that the rules against staking burden substantially more speech than necessary to protect the grounds. Occupy Boise submits evidence showing that only stakes that penetrate a foot or more harm the grounds. This argument ignores, however, the State's significant interest in controlling the aesthetic appearance of the Capitol Mall area and other State property. Even when the stakes are removed, having numerous divots in the grass could mar the aesthetic appeal of state grounds. Like chalking, it is the tangible medium – staking – that creates the very problem the rule seeks to remedy. And, as already discussed with respect to chalking, a "regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative," *Ward*, 491 U.S. at 800, as long as the "regulation promotes a substantial government interest that would be achieved less effectively absent the regulation," *id.* at 799.

Of course, if this were an-applied challenge, the Court may reach a different conclusion. This Court ruled that Occupy Boise's symbolic tent city could remain on state grounds, subject to reasonable time, place, and manner restrictions. Occupy Boise, as part of its symbolic tent city, staked the tents. The tents are arguably integral to Occupy Boise's message, and a tent – unlike a sign– generally must be staked. Thus, the rule against staking, as-applied to Occupy Boise's symbolic tent city, arguably would not

Memorandum Decision and Order - 14

leave open ample alternative channels of communication. But this question is not before the Court, and the Court therefore will not invalidate the rule as-applied to Occupy Boise.

### (3) Grounds-maintenance restrictions

The rules provide that "State Maintenance and Improvements shall have priority over all other use of the State Facilities." IDAPA 38.04.06.200.04, 38.04.08.200.04. The rules similarly provide that a maintenance and improvement schedule will be published on the Department's Web site and may be modified according to several specified reasons. *Id.* 38.04.06.302.04, 38.04.08.302.01.e.

The State has a legitimate interest in maintaining the grounds of state property. But the Court worries that by prioritizing the grounds maintenance schedule over First Amendment activity, the rules could inhibit the timely exercise of First Amendment rights and, in effect, prohibit spontaneous political expression. *Arizona Right to Life Political Action Committee v. Bayless*, 320 F.3d 1002, 1008 (9th Cir. 2003). "Restricting spontaneous political expression places a severe burden on political speech because, as the Supreme Court has observed, 'timing is of the essence in politics ... and when an event occurs, it is often necessary to have one's voice heard promptly, if it is to be considered at all.'" *Id.* (quoting *Shuttlesworth v. City of Birmingham*, 394 U.S. 147 (1969) (Harlan, J., concurring)).

This possibility, however, seems too remote to invalidate the grounds maintenance rules on these grounds. Mowing and watering the lawn simply does not take that much time – a few hours at the most. Such a short delay only places a minimal burden on

spontaneous speech.  Indeed, even a twenty-four-hour advance notice requirement for a spontaneous event is not categorically unconstitutional.  *Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1037 (9th Cir. 2009).  And for those limited periods when the lawn areas are not available because of the grounds maintenance schedule, many other areas on the Capitol Mall grounds will be available, leaving open ample alternative means of expression.  For these reasons, the Court finds that the grounds maintenance rules are reasonable time, place, and manner restrictions.

### C. *The Waiver Rules for "State Events" Improperly Elevate Government Speech Over Other Speech and Grant the State Too Much Discretion.*

The Director of the Department of Administration can waive any of the administrative rules for "State Events."  IDAPA 38.04.06.200.03 and 38.04.08.200.04. The rules define a "State Event" as a "function[] initiated and controlled by any state of Idaho agency, board, commission, officer or elected official acting on behalf of the state of Idaho." IDAPA 38.04.06.010.15, 38.04.08.010.14.   Occupy Boise argues that the rules that allow the Department to waive the rules for "State Events" improperly elevates state-sponsored speech over other speech.

While the Ninth Circuit has not ruled on this question, it has stated that it is "troubled by [a] wholesale exemption for government speech."  *Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998).  This Court shares that concern.  Two problems with the waiver rules for "State Events" come to mind.

First, the State has failed to identify any legitimate reason to allow the Director of the Department of Administration to waive the rules for "State Events" but not for other events that failed to garner the State's favor. Distinguishing between "State Events" and other events without articulating a legitimate reason for the distinction essentially undermines any legitimate reason the State may offer for a particular rule. Courts will only permit a restriction on expressive conduct in traditional public fora if the State asserts a significant interest that can only be advanced by the restriction. But if the State allows some to invade that interest, it suggests that the restriction on others is to suppress their speech rather than to vindicate a legitimate interest.

Of course, it would be permissible for the State to discriminate between events receiving state sponsorship and those that did not if it succeeded in making some showing that an event not sponsored by the State imposed greater societal costs than a State Event, and if it relied on some narrow regulations precisely drawn to prevent incurrence of these costs. But that is not what the State did.  Instead, it chose to rely entirely on the fact of state co-sponsorship to categorize various events. Thus, the Director may elect to waive the rules for a State Event while those that do not receive state sponsorship must adhere to all the rules. This approach is tantamount to giving priority to the official voice of the State – "a position which is patently inconsistent with the Constitution." *Women Strike for Peace v. Morton*, 472 F.2d 1273, 1280, 153 (C.A.D.C. 1972).  "The First Amendment was not designed to protect the voice of government or government-approved speech.

The First Amendment in this country protects the voice of the people, even against government." *Id.* (citing *Keyishian v. Board of Regents*, 385 U.S. 589, 603 (1967)).

The other problem with the "State Event" waiver rules is that they do not sufficiently constrain the State's discretion in sponsoring events it favors.  The Director of the Department of Administration has "sole discretion" to decide whether to sponsor an event, and the Director has full discretion to waive the rules for a state-sponsored event.  *Johnston Dep.* 179:12-180:4, Dkt. 84-16.

It is a fundamental tenet of First Amendment principles that restrictions on the right to free speech or assembly must not be so vague as to afford unbridled discretion to the government authority seeking to abridge those rights. *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 151 (1969). The Supreme Court has observed that "[a] government regulation that allows arbitrary application is inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of supporting a particular point of view." *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130–31 (1992) (citation and internal quotation marks omitted). Consequently, reasonable time, place, and manner restrictions on public speech "must contain narrow, objective, and definite standards to guide" the appropriate authority. *Id.* at 130 (citation and internal quotation marks omitted). Absent such a scheme, "the danger of censorship and of abridgement of our precious First Amendment freedoms is too great." *Id.* (citation omitted).

Because nothing limits the State in choosing to sponsor an event, the rules, in effect, permit the State to waive the rules for virtually any activity the State chooses to sponsor.  For example, Ric Johnston, the Facilities Services Manager for the Department of Administration, testified that an event called "Add the Words, Idaho," which protested the Idaho legislature's failure to pass a bill protecting gay and transgender people, was a "State Event" simply because a state senator was present. *Johnston Dep.* 136:23-140:2, Dkt. 84-16.  Or, if the Governor or First Lady attend an event it is considered a State-sponsored event. *Id.* at 177:9-14.  Therefore, a state senator or the governor could opt to sponsor any event she chose, and the Department could choose to waive the rules for this event.  *Id.* at 179:12-180:4.  Indeed, Occupy Boise has submitted evidence suggesting that the Department has made an extra effort to ensure certain events received state sponsorship to avoid a potential rule violation.  *Id.* at 176:14-179:5.  On the other hand, nothing in the rules requires state sponsorship of an Occupy Boise rally, and therefore this rally would be subject to all restrictions. The rules therefore allow the State to practice content-based or viewpoint-based discrimination in deciding which ideas it will celebrate and which it may marginalize, circumscribe, and restrict.

The Court finds it troubling that if a private organization has political connections to state officials, or is considered worthy of attention by the State, the Department has the authority to waive all rules for that organization, while an unpopular or unconnected group would have to adhere to all the rules. Granting waivers to favored speakers (or, more precisely, denying them to disfavored speakers) is unconstitutional. *Thomas v.*

*Chicago Park Dist.,* 534 U.S. 316, 325 (2002).[4] The Court therefore finds that the rule allowing waivers for "State Events" is unconstitutional.  If the State wishes to grant waivers for certain events, the Department of Administration must draft a rule that would allow waivers for any event, regardless of the speaker, and which contains narrow, objective, and definite standards to guide the appropriate authority in granting or denying those waivers.

### D. *The Capitol Steps Permitting System, For the Most Part, Passes Constitutional Muster.*

For the Capitol steps, the Rules impose a hybrid permit reservation and "first-come, first used" rule.  Occupy Boise argues that this permitting system impermissibly chills speech because the permitting provisions invest too much discretion in state officials, are overbroad, and not narrowly tailored.  Moreover, according to Occupy Boise, the "tweaks" to the permitting rules did not fix the original problems with the rules.

### (1) First-come, first-used rule

The permitting provisions allow groups of two or more to obtain a permit to use the Capitol steps.  Under the "first-come, first used provision," however, one who has not obtained a permit to use the Capitol steps may still use the steps on a first-come, first-

---

[4] The Thomas Court rejected a facial challenge on this ground because "a pattern of unlawful favoritism" had not been shown. 534 U.S. at ——, 122 S.Ct. at 781. In this case however, the blanket waiver for favored groups is explicit and a facial challenge is appropriate.

used basis.  IDAPA 38.04.08.400.01.  Occupy Boise criticizes the "first-come, first used" provision for not being narrowly tailored because it says the provision does not make clear that multiple small groups could use the steps simultaneously; and even if they did, the rules "offer no guidance to limit enforcement officers' discretion in deciding when a group is large enough to have "first used" the steps, impermissibly chilling speech." *Occupy Boise's First Mot. for Sum. J. Br.* at 21, Dkt. 84-2.

The Court agrees with the State that Occupy Boise's fears in this regard are largely imagined.  The Court fails to see how a permit system granting priority of use to an applicant while at the same time freely allowing non-permitted use to the extent public safety is not compromised offends the First Amendment.  And Occupy Boise fails to convince the Court otherwise.  Of course, if a group was unreasonably denied access to the Capitol steps because another group was using them, the group denied access could bring an as-applied challenge, but Occupy Boise's facial challenge to the first-come, first used rule fails.

### (2) Content-based denials

Occupy Boise argues that the permitting provisions allow for impermissible content-based denials.  The First Amendment generally prevents the government from proscribing speech because of disapproval of the ideas expressed, *R.A.V. v. City of St. Paul,* 505 U.S. 377, 382 (1992), and, indeed, "[c]ontent-based regulations are presumptively invalid." *Id.* (quoting *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.,* 502 U.S. 105, 115 (1991)).

Memorandum Decision and Order - 21

But freedom of speech, has never been interpreted "to give absolute protection to every individual to speak whenever or wherever he pleases or to use any form of address in any circumstances that he chooses." *Cohen v. California*, 403 U.S. 15, 19 (1971). Rather, the First Amendment allows restrictions on speech in a few limited areas, which are "of such slight social value as a step to truth any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Chaplinsky v. New Hampshire,* 315 U.S. 568, 571 (1942)

One such permissible restriction on speech is the proscription on so-called "fighting words." *See Chaplinsky,* 315 U.S. at 572. The Supreme Court has defined "fighting words" as "those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Id.* The Supreme Court has consistently held that government may proscribe speech that is directed towards inciting or producing lawless action, and is likely to incite or result in such action. *See, e.g., Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969).

In *Yates v. United States*, however, the Supreme Court held that only the advocacy of concrete violent action may be proscribed, but not "advocacy and teaching of forcible overthrow as an abstract principle, divorced from any effort to instigate action to that end." 354 U.S. 298, 318 (1957), *overruled in part on other grounds by Burks v. United States*, 437 U.S. 1 (1978). In B*randenburg* as well, the Court made clear that government may proscribe advocacy of lawlessness only where such advocacy is directed towards, and is likely to result in, "*imminent* lawless action." 395 U.S. at 447 (emphasis added).

Occupy Boise criticizes the permitting rules here on the grounds that they allow the Department to deny a permit for the "mere advocacy" of ideas. Not so.

The rules identify five bases for which a permit will be denied:

*If the use would cause a clear and present danger* to the orderly process of state of Idaho government or to the use of the State Capitol Exterior due to advocacy of:

    i.      The violent overthrow of the government of the United States, the state of Idaho, or any political subdivision thereof;

    ii.     The willful damage or destruction, or seizure and subversion of public property;

    iii.    The forcible disruption or impairment of or interference with the regularly schedule[d] functions of the state of Idaho;

    iv.    The physical harm, coercion, intimidation or other invasions of the lawful rights of public officials or the public; or

    v.     Other disorders of a violent crime.

IDAPA 38.04.08.401.02.i (emphasis added). So a permit will be denied only if the requested use includes advocacy which would "cause a clear and present danger to the orderly process" of the state government or the use of the building. Thus, contrary to what Occupy Boise contends, the rules do not allow the Department to deny a permit for "mere advocacy" of ideas. Instead, the rules make clear that there must be advocacy ***and*** "a clear and present danger" to the orderly process of government. The permitting rules are therefore not impermissibly content based or unconstitutionally vague.

### (3) Imposition of Costs

Third, Occupy Boise contends the permitting system is flawed because it grants the State too much discretion in imposing costs on permit holders.  Because a government regulation that allows for arbitrary application is "inherently consistent with a valid time, place, and manner regulation," laws that predicate expressive activity on the prior acquisition of a permit "must contain narrow, objective, and definite standards to guide the licensing authority." *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 131 (1992) (citation and internal quotation marks omitted).

Like the costs provision in *Forsyth,* which "left to the whim of the administrator" the decision of how much to charge for police protection or administrative time, "or even whether to charge at all," *id.* at 133, the cost provision here grants the Department of Administration too much discretion in deciding whether to impose costs.  IDAPA 38.04.08.400.07.  The rule provides that "[i]ndividuals, entities, and organizations *may* be charged for direct costs as set forth in the Permit including, but not limited to, the following: trash collection, janitorial services, and security services." *Id.*  The use of "may" suggests that the Department could choose not to impose direct costs.  Therefore, the regulation allows the Department to encourage some speech by not imposing costs while discouraging other views through the arbitrary application of costs. "The First Amendment prohibits the vesting of such unbridled discretion in a government official." *Id.*

### (4) Permit Revocations and Conditions

Occupy Boise also contends the permitting system fails to provide adequate standards to guide the State's discretion in revoking permits.

Permits may be revoked for the violation of any term of the permit or any violation of law or the use rules. IDAPA 38.04.08.402.  And while the permitting system allows the Department of Administration to impose conditions on a permit, it may only impose conditions that serve the purpose of "protecting persons and property." IDAPA 38.04.08.400.08.  "Protecting persons and property" is the standard that guides the Department in crafting specific conditions. In other words, the Department would use this more general standard to create more specific conditions contained in the permit.  The Department could then revoke a permit only if a permit holder violated a specific condition of the permit.

Thus, the Department cannot revoke a permit based on an overly general, standardless criteria that the Ninth Circuit considered, and struck down, in *Seattle Affiliate v. City of Seattle*, 550 F.3d 788 (9th Cir. 2008). There, the chief of police could move marchers onto sidewalks and off of streets only "in the interest of vehicular or pedestrian safety." 550 F.3d at 799. The court agreed that the discretion of the police to move marchers "in the interest of" safety was too broad. *Id.* at 800. Here, by contrast, the Department can only revoke a permit if the permittee violates specific provisions of the

permit, which can be challenged in advance if it imposes conditions that violates the permittee's rights.[5]  And, the specific provisions imposed must be "necessary to protect persons and property," which the Court finds to be far more specific than the "in the interest of vehicular and pedestrian safety" standard found to be overly vague in *Seattle Affiliate.*

### (5) Revised Permitting Rules

Finally, Occupy Boise argues that the revised permitting rules – which no longer contain language deeming an ignored permit application to be a denied permit application – did not fix the problems with the permitting rules because the rules still do not require the State to issue a written decision.  In *Forsyth*, the Supreme Court rejected as unconstitutional a permitting fee ordinance because the ordinance did contain objective standards and did not require the licensing administrator to provide an explanation for his decision, making the decision "unreviewable." 505 U.S. at 133.  *See also Thomas,* 534 U.S. at 324 (holding that ordinance did not confer excess discretion where the licensor "must clearly explain its reasons for any denial," and where the statute's standards are "enforceable on review" by appeal to an administrative board and then to the state courts).

---

[5] The permit may also be revoked if the permit holder violates specific laws or rules.  However, again, the permit holder would be aware of those laws and rules in advance and could, if appropriate, challenge any law or rule which violates their First Amendment rights.

The permitting rules in this case, however, offer far less basis for an "unbridled discretion" challenge than the *Forsyth* ordinance. In fact, the rules contain clear and precise standards, which the Department can apply in making permitting determinations.

The permitting rules not only require the Department to approve or deny a complete application with two business days of the submission of an application, IDAPA 38.04.08.401.01, but they also specify the grounds for denying a permit, IDAPA 38.04.08.401.02.  These two rules, taken together, suggest that the Department must issue a written decision detailing its grounds for denying a permit.  Moreover, the Department's denial of a permit is subject to appeal, IDAPA 38.04.08.403, in accordance with the contested case provisions – either informal or formal – of the Idaho Administrative Procedure Code , Idaho Code §§ 67-5240 to -5253, with judicial review available under Idaho Code § 67-5270.  IDAPA 38.04.08.403.03 (providing for expedited, informal appeal disposition); IDAPA 38.04.08.403.04 (incorporating Idaho Rules of Administrative Procedure of the Attorney General (IDAPA 04.11.01) that govern formal contested case proceedings).

Thus, unlike the licensing provisions in *Forsyth*, which neither contained objectives standards nor required a written denial, the permitting rules here bind the Department's discretion – both substantively, with objective standards, and procedurally, with an appeal mechanism.

Memorandum Decision and Order - 27

**E.  *The Revised Durational Limits Are Not Sufficiently Tailored to Advance a Significant State Interest.***

The revised durational regulation for "the Capitol Mall & other State Facilities" limits the duration of a "Public Use at any single facility" to seven consecutive days. IDAPA 38.04.06.201.  "A Public Use may continue at the State Facilities after a seven (7) consecutive day period if the Public Use does not use the same facility for twenty-four (24) hours or more between each seven (7) consecutive day period." *Id.*  The durational restriction for the "Idaho State Capitol Exterior" likewise limits a "Public Use" on the "State Capitol Exterior" to seven consecutive days, but allows it to resume "if the Public Use does not use the State Capitol Exterior" for 24 hours or more between each seven-consecutive day period. IDAPA 38.04.08.201.

While the seven-day durational limit is content neutral, and it arguably serves the state's legitimate interest of preventing one group from monopolizing the State's property, the durational limits are not "narrowly tailored" to achieve this goal because a less restrictive alternative could be implemented.  The durational limits apply regardless of whether a First Amendment activity is large enough to compete with other uses and regardless of whether an activity, no matter the size, would actually prevent anyone else from using a location.

It is true that government may curb the communication of one speaker so that another can have his chance. But any such restriction on the right to express views must be narrowly drawn so as to infringe on First Amendment rights only to the extent

necessary to vindicate the rights of others. *Long Beach*, 574 F.3d at 1025. If the state wishes to regulate speech, then it must undertake the burden to show a precise nexus between that speech and some evil which the state has a right to prevent. Without narrowly drawn standards,  judicial review to insure the existence of such a nexus is impossible, and if the First Amendment means anything at all it requires at least that a party be given a judicial determination that such a nexus exists before the state can silence him. *Freedman v. Maryland*, 380 U.S. 51, 58 (1965). "Expansive language can signal the absence of 'a close fit with the governmental interests underlying the permitting requirement.'" *Long Beach*, 574 F.3d at 1025 (quoting *Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1040-42 (9th Cir. 2006).

Courts analyzing whether a regulation is "narrowly tailored" may also ask whether there are obvious alternatives that would achieve the same objectives with less restriction of speech.  Even if the State need not choose the "least restrictive or least intrusive means" of achieving the government's legitimate purpose, *Ward*, 491 U.S. at 798, "an assessment of alternatives can still bear on the reasonableness of the tailoring." *Id.* (quoting *Menotti v. City of Seattle*, 409 F.3d 1113, 1131 n. 31 (9th Cir. 2005)).

In this case, the State provides no reason why its interest in providing access to other protest groups would be achieved less efficiently through less restrictive means: a group could occupy state property indefinitely until another group seeks to occupy the same area, or state security personnel and law enforcement could separate groups who are simultaneously assembling in the same location.  Indeed, the State has already given

itself authority to manage the possibility of competing uses: the rules expressly allow security personnel and law enforcement to separate groups who are simultaneously assembling in the same location. IDAPA 38.04.06.203 and 38.04.08.203.

Or perhaps the State could place durational limits only on larger groups that would pose a real danger of monopolizing state grounds or competing with other uses, rather than placing the durational limits on all First Amendment activity irrespective of the group's size.  *C.f. Long Beach*, 574 F.3d at 1038 ("The regulation requires twenty-four-hour advance notice irrespective of whether there is any possibility that the event will interfere with traffic flow.").

Moreover, the rules fail to leave open ample alternative channels of communication for residents of Lewiston or Idaho Falls.  Individuals assembling to protest at the state office buildings in those cities would be foreclosed altogether from expressing their grievances on state property, unless they could travel to another location across the state on the eighth day.  Thus, the durational limits are facially unconstitutional.

Because reason suggests that a less restrictive rule would serve the State's legitimate interests just as effectively, and no evidence to the contrary has been introduced, the Court finds that the seven-day durational limits violate the First Amendment.

### F.  *Utility Service*

The Rules now provide, for all public uses, that the Director of the Department of

Administration "may authorize limited use of electrical service." IDAPA 38.04.06.313 and 38.04.08.314.  Occupy Boise contends that these rules fail First Amendment scrutiny because they allow the Director to limit electrical service "as she wishes," without any standards to guide her discretion.  *Occupy Boise Opening Brief* at 5, Dkt. 106-1. Occupy Boise also criticizes the rules because they do not require the Director to explain her decision.

But the First Amendment does not require that the State provide electrical service to groups using State property. *Ysursa v. Pocatello Educ. Ass'n,* 555 U.S. 353, 358 (2009) ("[w]hile in some contexts the government must accommodate expression, it is not required to assist others in funding the expression of particular ideas, including political ones").  Absent such a right, "the State need only demonstrate a rational basis to justify the [subsidization denial]." *Id.* at 359.  This means, to succeed on its attack of the Utility Section rules, Occupy Boise must establish either (1) viewpoint discrimination or (2) content discrimination and the lack of a rational basis for such discrimination. *Regan v. Taxation With Representation of Wash*., 461 U.S. 540, 549 (1983).  Occupy Boise can do neither. The Utility Section rules are content neutral, and Occupy Boise has come forward with no evidence of a pattern or practice of content-based enforcement.

Moreover, even if the State did deny use of electrical service, ample alternative channels of communication still exist.  Not allowing use of electrical service does not serve to ban any particular manner or type of expression at a given place or time.  Rather, the rule continues to permit expressive activity – groups can use megaphones or signs or

chant in unison to convey their message.  That the denial of use of the State's electrical system may reduce to some degree the potential audience for the respondent's speech is of no consequence, for there has been no showing that the remaining avenues of communication are inadequate.  *Ward*, 491 U.S. at 802.

In fact, the Court questions whether Occupy Boise should be permitted to bring a facial challenge to this rule. As the Supreme Court explained in *Ward*, facial challenges are usually limited to challenges to regulations that involve licensing schemes that vest unbridled discretion in a government official to permit or deny expressive activity – not to rules, such as the electrical rule here, that do not grant the government official the right to ban certain speech altogether:

> Our cases permitting facial challenges to regulations that allegedly grant officials unconstrained authority to regulate speech have generally involved licensing schemes that "ves[t] unbridled discretion in a government official over whether to permit or deny expressive activity." The grant of discretion that respondent seeks to challenge here is of an entirely different, and lesser, order of magnitude, because respondent does not suggest that city officials enjoy unfettered discretion to deny bandshell permits altogether…. Since respondent does not claim that city officials enjoy unguided discretion to deny the right to speak altogether, it is open to question whether respondent's claim falls within the narrow class of permissible facial challenges to allegedly unconstrained grants of regulatory authority.

491 U.S. at 793-794 (citations omitted).

Like in *Ward*, the grant of discretion that Occupy Boise seeks to challenge here "is of an entirely different, and lesser, order of magnitude" because Occupy Boise does not argue that the Director enjoys unfettered discretion to deny a permit altogether.  Instead, as in *Ward*, Occupy Boise contends only that the State, by exercising its right to deny

state-subsidized electrical services, could choose to provide inadequate electrical service for groups based on the content of their speech. *Id.* Because Occupy Boise does not complain that state officials enjoy unguided discretion to deny the right to speak altogether, "it is open to question whether [Occupy Boise's] claim falls within the narrow class of permissible facial challenges to allegedly unconstrained grants of regulatory authority." *Id.*

However, regardless of whether Occupy Boise has brought a proper facial challenge to the electrical service rules, its claim fails because it has not proven either viewpoint discrimination or content discrimination and the lack of a rational basis for such discrimination.

### G. *Revised Indemnification Provisions*

The original indemnity provisions contained a broadly-worded clause requiring a "user" of State Facilities to indemnify and hold harmless the State for harm "arising out of or in any way connected with the use of the State Facilities." IDAPA 38.04.06.401.03/ IDAPA 38.04.08.501.03. The user liability provisions contained equally broad language holding users responsible for all claims "arising from use of the State Facilities." IDAPA 38.04.06.400.01 and 38.04.08.500.01.

The State tried to narrow the original rules by adding four words. The indemnity provisions now deem that all users agree to indemnify the State for all damage "arising out of or in any way connected with the use of the State Facilities *by the user*," and the liability provisions assign to people and groups who come on to the State grounds all

liability arising "from *their* use of the State Facilities." [6] Occupy Boise originally argued that the provisions in the rules about indemnification were too broad to withstand scrutiny, and Occupy Boise now contends that the revised indemnification provisions do not correct this original issue. *Occupy Boise's Original Opening Brief* at 20, Dkt. 84-2. The Court agrees.

In *Long Beach*, the Ninth Circuit held unconstitutional (1) an indemnity clause that required permit holders to indemnify the city (a) for harm caused by third parties' reactions and (b) harm caused by the city's actions, and (2) a liability clause that made the permit holder responsible for harm to third parties caused by the city itself or by other third parties. 574 F.3d at 1039. By contrast, in *Kaahumanu v. Hawaii*, the Ninth Circuit upheld an indemnity provision that made clear that the permit holder would only be

---

[6] IDAPA 38.04.06.401.03, as revised, provides:

> Indemnification. Any individual, entity or organization permitted to use the State Facilities is deemed to agree to indemnify the state of Idaho from and against all claims, demands, actions or causes of action, together with any and all losses, costs or related expenses asserted by any group or persons for bodily injury or damage to property arising out of or in any way connected with the use of the State Facilities by the user.

IDAPA 38.04.06.401.01, as revised, provides:

> User Retains Liability. Individuals, entities, and organizations using the State Facilities are responsible and liable for all suits, damages, claims or liabilities arising from their use of the State Facilities. The state of Idaho shall have no liability for injury to private property, including posters, placards, banners, signs, equipment, tables, materials, and displays on the State Facilities.

IDAPA 38.04.08.501.03 and IDAPA 38.04.08.501.01 differ only by their reference to the "State Capitol Exterior" rather than to "State Facilities."

required to indemnify and hold harmless the Department of Land and Natural Resources for harm caused by "any act or omission on part of Applicant." 682 F.3d 789, 809 (9th Cir. 2012).  Likewise, the Ninth Circuit found acceptable an indemnity provision limited only to the "acts or omissions of the permittee." *Food Not Bombs*, 450 F.3d at 1056 n.10.

In this case, the revised rules extend indemnity to all harm "arising out of or in any way connected with the use of the State Facilities by the user," IDAPA 38.04.06.400.03. and extend liability to "all suits, damages, claims or liabilities arising from their use," IDAPA 38.04.06.400.01 and 38.04.08.500.01.  These rules, unlike the provisions in *Kaaumanu* and *Food Not Bombs*, do not limit indemnity and liability to the acts or omissions of the users.  Instead, the Idaho rules plainly imposes liability and an indemnity requirement for harms caused by third parties – including the State.  Indeed, as Occupy Boise points out, the phrase "in any way connected" is the broadest language possible in a disclaimer clause. *County of Boise v. Idaho Counties Risk Management Program*, 151 Idaho 901, 905 (2011).

The Court therefore finds that the indemnity and liability provisions here are not narrowly tailored to the governmental interest in protecting the State from bearing costs arising from injuries or other liabilities due to the speaker's acts or omissions.  Tacking the words "by the user" or inserting the word "their" in the revised provisions did not fix this problem.  The provisions, as written, are still overbroad.

### 3.  Challenge to 2012 Rules

Finally, Occupy Boise attempts to revive its challenge to the old rules enacted in 2012.  Agency rules are subject to legislative review. Idaho Code § 67-5291. Exercising such review, the 2013 Legislature rejected several sections of the State Facilities and State Capitol Exterior rules. S. Concurrent Resolution Nos. 118 and 119. The rejected provisions included certain subsections of the Hours and Locations of Use section including, most importantly here, the hour limitations. The effect of the rejection—as reflected in the post-session rules—is that a Public Use may occur at any time. The revised rules also made modifications to other provisions not rejected in the Senate resolutions.  Those amendments included deletion of the terms "Events" and "Exhibits" from both rules and the redefinition of the term "Public Use" to encompass all uses of the State Facilities and State Capitol's exteriors except for "State Events."

Occupy Boise argues that simply because the State has promulgated new 2013 rules does not mean that Occupy Boise's challenges to the 2012 rules are moot. According to Occupy Boise, although the State replaced the 2012 rules that were in place from April 17, 2012, through October 3, 2012, by rules enacted in October 2012, the Legislature never rejected any part of the previous rules.  Therefore, the State could change the rules yet again and could still cite Occupy Boise for violations of the rules that occurred between April 2012 and October 2012.  The Court disagrees.

"To qualify as a case fit for federal-court adjudication, an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Arizonans*

*for Official English v. Arizona,* 520 U.S. 43, 67 (1997) (internal quotation marks omitted). "If the controversy is moot, both the trial and appellate courts lack subject matter jurisdiction." *Pilate v. Burrell (In re Burrell)*, 415 F.3d 994, 998 (9th Cir. 2005).

The mootness doctrine, however, contains a "voluntary cessation" exception to mootness. *Rosemere Neighborhood Ass'n v. USEPA*, 581 F.3d 1169, 1173 (9th Cir. 2009). "Under this doctrine, the mere cessation of illegal activity in response to pending litigation does not moot a case, unless the party alleging mootness can show that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* (internal quotation marks omitted). Without such an exception, the defendant would be free to return to his or her old ways. *Id.*

"[A] defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000). But the "government's change of policy presents a special circumstance in the world of mootness." *American Cargo Transport, Inc. v. United States*, 625 F.3d 1176 (9th Cir. 2010). "[C]essation of the allegedly illegal conduct by government officials has been treated with more solicitude by the courts than similar action by private parties." *Id.* (citation omitted).

In this case, the Legislature has rejected the hours limitation provision outright. Thus, the likelihood that the Department will reinstate the hours limitations is almost nil. Therefore, Occupy Boise's challenge to the hours limitation provisions is moot.

On the other hand, the 2013 did not reject the definitions for "Public Use," "Event" and "Exhibit," and the Department's choice to delete the "Event" and "Exhibit" definitions and revise the "Public Use" was entirely voluntary.  So, theoretically, the Department could reinstate these rules at a later time. But the fact remains that those rules are no longer in effect, and it is entirely speculative to assume that the Department will reinstate provisions it has deleted or revised.  Indeed, the rules change is more than a simple change in policy, or a shift in agency interpretation, which the Ninth Circuit has held is enough to moot a case.  *See, e.g., America Cargo Transport, Inc. v. U.S.*, 625 F.3d 1176, 1180 (9th Cir. 2010) (finding case moot because the government changed its policy and agreed with the plaintiff's interpretation of administrative process). It therefore follows that an actual rewriting of agency rules moots Occupy Boise's challenge to the 2012 definitions of "Event," "Exhibit," and "Public Use."

Occupy Boise's entirely speculative fear that its members might be cited for alleged rule violations that occurred during an April-June 2012 period and single days in August and September of 2012 does not save Occupy Boise's challenge to the revised 2012 rules.  In February 2012, the Court issued an injunction that enjoined the State from removing Occupy Boise's 24/7 tent city. The Court later modified the injunction to require the temporary removal of the tent city to allow for grounds rehabilitation, but it permitted Occupy Boise to resume its 24/7 activities once the rehabilitation was completed. The Court's initial and modified injunction would preclude any infraction proceedings against Occupy Boise for their continuous use of the Capitol Annex.

Occupy Boise's contrary claim thus assumes that the Department would ignore this Court's injunction and cite Occupy Boise for alleged infractions of now-deleted or revised rules, which occurred more than a year ago. The Court finds such an assumption to be unwarranted.

Accordingly, the Court finds that Occupy Boise's challenge to the 2012 hours limitation and to the 2012 definitions of "Events," "Exhibits," and "Public Uses" is moot.

## ORDER

**IT IS ORDERED that:**

1.  Occupy Boise's Second Motion for Partial Summary Judgment (Dkt. 106) is GRANTED in part and DENIED in part as set forth in this decision.

2.  Occupy Boise's Amended First Motion for Partial Summary Judgment (Dkt. 116) is GRANTED to the extent that Occupy Boise sought to make clear that it never withdrew its challenges to the 2012 rules, but it is DENIED to the extent that Occupy Boise sought a ruling that its challenges to the deleted or revised 2012 rules was not moot.

DATED: November 1, 2013

B. Lynn Winmill
Chief Judge
United States District Court

Memorandum Decision and Order - 39