Casey Parsons (ISB no. 11323)
WREST COLLECTIVE
812 W. Franklin St.
Boise, ID 83702
Tel: (208) 742-6789
ritchie@wrest.coop
casey@wrest.coop
david@wrest.coop

Attorneys for Plaintiff Matthew Alexander Newirth

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **EDWARD WATTERS, DEAN GUNDERSON, STEVEN FARNWORTH, MATTHEW ALEXANDER NEWIRTH**, individuals, and **OCCUPY BOISE**, an Idaho unincorporated non-profit,<br><br>*Plaintiffs*,<br><br>v.<br><br>**BRADLEY JAY LITTLE**, in his official capacity as the Governor of the State of Idaho, **STEVEN BAILEY**, in his official capacity as the Director of the Idaho Department of Administration, and **COL. KEDRICK R. WILLS**, in his official capacity as the Director of the Idaho State Police,<br><br>*Defendants*. | Case No. 1:12-cv-0076-REB<br><br>**BRIEF IN SUPPORT OF MOTION FOR TRO, PRELIMINARY INJUNCTION, ORDER TO SHOW CAUSE, AND CONTEMPT** |

**I.     FACTUAL BACKGROUND**

On November 5, 2011 Occupy Boise established a tent city protest on the grounds of the Capitol Annex to advocate as part of the broader, national Occupy movement. (Dkt. 2-2, ¶ 6). The protest highlighted and symbolized the consequences of economic inequality and the impacts of the economic recession on the lives of everyday Americans. (Dkt. 2-2, ¶ 12). At the time of the demonstration, Plaintiff Matthew Alexander Neiwirth was not able to attend the demonstration for the majority of each day. (Dkt. 2-2, ¶ 14). Following the establishment of the Occupy Boise demonstration, demonstrators were met with threats from the Idaho State Police to clear the protest on the basis that they were "camping" in violation of Idaho law and the regulations for the use of the Capitol Mall contained in the regulations of the Idaho Administrative Procedures Act. (Dkt. 13-1, ¶ 2).

Demonstrators with the Occupy Boise protest sought permanent injunctive relief for the purpose of using tents for assembly purposes and for symbolic speech. This Court granted that relief, guaranteeing that demonstrators would not have those tents seized under I.C. §§ 67-1613 or 67-1613A on the basis that they were engaged in camping, so long as they were not sleeping on the premises. (Dkt. 144).

Now, again, demonstrators, including Plaintiff Matthew Alexander Newirth, have established a protest utilizing symbolic and assembly tents on the grounds of the Capitol Annex, this time in response to ongoing genocidal military intervention in the country of Palestine. (Decl. Neiwirth ¶ 2, 4, 7; Decl. Manwill ¶ 3-7; Decl. Tucker ¶ 3-5). As with Occupy Boise, their tent city protest is part of a worldwide movement of similar tent city protests, all directing public attention to the plight of Palestinians living in tent cities

and under attack by Israel. (Decl. Manwill ¶ 3-7; Decl. Neiwirth ¶ 2, 4, 7; Decl. Tucker ¶ 3-5); Diane Budds, "How students built a pro-Palestine protest movement, one tent at a time," *Fast Company* (May 9, 2024), https://www.fastcompany.com/91121335/why-it-matters-where-people-protest ("Like Civil Rights-era sit-ins that targeted segregated places like bus stations, lunch counters, and beaches, . . . . the spatial elements of these protests speak volumes about the issues at hand and future that the protesters would like to see."). And once again, demonstrators here in Boise face ongoing police enforcement action from Defendants, who have violently and forcibly seized those symbolic and assembly tents repeatedly since its establishment on the evening of May 3, 2024. (Decl. Manwill ¶ 10-18; Decl. Neiwirth ¶ 9-10; Decl. Tucker ¶ 8-16).

The severity of the situation in Gaza in particular and Palestine more broadly that demonstrators seek to communicate and make visible to policymakers in Idaho cannot be overstated. Over one-million individuals have been forced to take refuge in Rafah on the Gaza Strip, and hundreds of thousands of people have been relegated to tent cities because of the ongoing military violence. ("War in Gaza drove them from their homes. Now, many Palestinians can't even find tents" https://www.npr.org/2024/01/19/1225250933/gaza-rafah-tents-shortage). "You look outside the window of one of our facilities, and all I could see was the sea of these makeshift structures,' said Juliette Touma, a spokesperson for UNRWA, the U.N. agency that aids Palestinians. She returned Tuesday from a trip to Gaza." *Id.* Even now, individuals in Rafah are being faced to flee those tent cities under threat of further military escalation and violence. ("Satellite imagery shows Palestinians fleeing Rafah's tent cities as threat of

3

major attack looms" https://www.cnn.com/2024/05/09/middleeast/rafah-palestinians-refugees-fleeing-intl/index.html).

On the evening of May 3, 2024, demonstrators organizing under the name "Peoples' University" established their protest on the grounds of the Capitol Annex, erecting tents for two purposes protected by the First Amendment. First, demonstrators have erected symbolically expressive tents for reasons directly germane to their core speech: to highlight the housing insecurity and displacement faced by individuals in Palestine as a result of military violence and intervention. (Decl. Neiwirth ¶ 2, 4, 7; Decl. Manwill ¶ 3-7; Decl. Tucker ¶ 3-5). Second, demonstrators have been utilizing the tents for assembly purposes to hold meetings and discussions to organize themselves and to educate the themselves as well as the public. (Decl. Manwill ¶ 9; Decl. Neiwirth ¶ 6; Decl. Tucker ¶ 7). Since erecting the demonstration on the grounds of the Capitol Annex, demonstrators have faced multiple enforcement actions from Defendants in violation of the permanent injunction previously entered in this case. (Decl. Manwill ¶ 10-18; Decl. Neiwirth ¶ 9-10; Decl. Tucker ¶ 8-16).

Early in the morning on May 4, 2024, Idaho State Police swept the camp, seizing all of symbolic and assembly tents on the basis that demonstrators were engaged in "camping." (Decl. Manwill ¶ 11; Decl. Tucker ¶ 9). Defendants preposterously contend that water bottles in the tents occupied by demonstrators and that demonstrators having "red, puffy eyes" were indicia of camping—a justification this Court explicitly rejected in a hearing later that afternoon. *Id.*

Between the late night on Sunday, May 5, 2024 and the following morning, Idaho State Police seized another tent on the basis that the individuals inside had "red, puffy eyes." (Dec. Manwill ¶ 12). Defendants later instructed the demonstrators that they must remove their symbolic and assembly tents each night at 6:30 PM until 7:00 AM so that the grounds of the Capitol Annex could be watered, with the exception of Wednesdays when the demonstrators would also need to wait until after the grounds had been mowed. *Id.* To comply with this request, demonstrators relocated their demonstration to the apron of the Idaho State Capitol on the evening of Tuesday, May 7, 2024, returning to the grounds of the Capitol Annex after the grounds were mowed the following morning. (Dec. Manwill ¶ 13; Decl. Tucker ¶ 10).

On the evening of Wednesday, May 8, 2024, demonstrators again relocated to the apron of the Idaho State Capitol steps at approximately 6:30 PM, where they were met with approximately 30 Idaho State Police officers. (Decl. Manwill ¶ 15; Decl. Tucker ¶ 11). Defendants instructed demonstrators that they would not be permitted to continue their demonstration utilizing symbolic and assembly tents on the apron, alleging that the tents obstructed emergency exits and entrances to the building. *Id.* Demonstrators took care to ensure that the symbolic and assembly tents would not block any entrances to the building in order to remain in compliance with the IDAPA regulations. *Id.* They were in the process of consolidating their belongings for that purpose when Idaho State Police moved in on the demonstration, again seizing their symbolic and assembly tents and shoving several protestors to the ground in the process. (Decl. Manwill ¶ 15; Decl. Tucker ¶ 11–12; Decl. Neiwirth ¶ 10). Police also took the demonstrators' signs. (Decl. Neiwirth ¶ 10).

Defendants did not provide the demonstrators with an inventory list of items seized, and still have not. (Decl. Manwill ¶ 15; Decl. Tucker ¶ 11). Demonstrators later relocated to the grounds of the Capitol Annex, seemingly having nowhere else to continue their vigil. (Decl. Manwill ¶ 16; Decl. Tucker ¶ 13).

At approximately 11:30 PM the following day, dozens of Idaho State Police and Boise Police Department officers arrived on the scene of the Capitol Annex, immediately instructing demonstrators to stand on the sidewalk while they again seized all of the symbolic and assembly tents. Demonstrators attempted to relocate to the concrete at the memorial located approximately 100 feet from the entrance of the Capitol Annex, but were told that they would not be permitted to continue their demonstration utilizing symbolic and assembly tents there, either. (Dec. Manwill ¶ 17; Decl. Tucker ¶ 14). Defendants again failed to provide an inventory list of items seized, and still have not. *Id.* To date, Defendants have refused to identify anywhere on the grounds of the Capitol Mall where demonstrators may continue their vigil overnight, despite their ongoing efforts to comply with the IDAPA regulations and orders from the Idaho State Police. (Decl. Parsons ¶ 2).

The next day, on Friday, May 10, 2024, demonstrators had again returned to the grounds of the Capitol Annex. (Decl. Manwill ¶ 18; Decl. Tucker ¶ 15). And again, Idaho State Police arrived on the scene at approximately 11:00 PM to seize their symbolic and assembly tents. *Id.* Demonstrators were ordered to remove the property associated with the vigil from the Capitol Annex grounds. *Id.* In the process of doing so, Idaho State Police arrested one demonstrator for Resisting and Obstructing in violation of I.C. § 18-705. (Decl. Tucker ¶ 16-17). Counsel attempted to meet and advise that individual at the Ada County

Jail, but jail staff and law enforcement refused to permit her to do so. (Decl. Tucker ¶ 17; Decl. Parsons ¶ 3-4).

Defendants still refuse to identify any location on the Capitol mall where demonstrators may continue their vigil overnight. (Decl. Parsons ¶ 2). Defendants have now repeatedly had the demonstrators' property seized without even following the statutory procedures that purport to authorize it. (Decl. Manwill ¶ 15, 17, 18; Decl. Tucker ¶ 11, 14, 15); *cf. Fitzpatrick v. Little*, No. 1:22-CV-00162-DCN, 2024 WL 1308925, at ** 4–5 (D. Idaho Mar. 26, 2024).

Plaintiff now seeks a Preliminary Injunction and 28 USC § 2202 relief from this Court requiring that Defendants permit the demonstrators to continue their vigil overnight on the grounds of the Capitol Mall. Plaintiff and the other demonstrators do not need this location to be on the grass of the Capitol Annex: so long as Defendants are able to identify a location where demonstrators may continue their vigil overnight during the maintenance of the Capitol Mall grounds, they will be satisfied. In light of the ongoing enforcement action, Plaintiff also seeks an Order to Show Cause and Order for Contempt regarding Defendants' ongoing enforcement action in light of the fact that they have failed to identify a location where they vigil may continue overnight.

II. **Legal Standard**

Ordinarily, this Court would separately analyze four factors before issuing a preliminary injunction: whether the plaintiff is likely to (1) succeed on the merits and (2) suffer irreparable harm, (3) whether the balance of equities tips in the plaintiff's favor, and (4) whether an injunction serves the public interest. *American Beverage Association v.*

7

*City & County of San Francisco*, 916 F.3d 749, 754 (9th Cir. 2019). But the (2) irreparable harm, (3) balance of equities, and (4) public interest requirements are all satisfied whenever there are serious First Amendment questions. *Id.* at 758. Thus, in a case like this one, if there are any serious questions going to the merits, a preliminary injunction should be issued. *Id.*; *see also Fellowship of Christian Athletes v. San Jose Unified School District*, 82 F.4th 664, 684 (9th Cir. 2023) (en banc).

The burden to show likelihood of success on the merits is also different in First Amendment cases. Though usually the party moving for a preliminary injunction must show it is likely to succeed, where a plaintiff makes a colorable First Amendment claim, the burden lies instead on the defendant to justify its restrictions. *ACLU of Idaho v. City of Boise*, 998 F. Supp. 2d 908, 913 (D. Idaho 2014) (citing *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1116 (9th Cir.2011)).

Thus, because the Plaintiff's First Amendment claims are at least colorable and the Defendants enforcement actions directly restrict speech and assembly, Defendants bear the burden to show that its actions are constitutional; if Defendants fail to meet that burden, this Court should restrain their ongoing enforcement action. First Amendment claims must be given "special solicitude" in general. *Charles v. City of Los Angeles*, 697 F.3d 1146, 1157 (9th Cir. 2012).

Under 22 USC § 2202, where the Court has previously entered a declaratory judgment, it may "be used as a predicate to further relief, including an injunction." *Powell v. McCormack*, 395 U.S. 486, 499, 89 S. Ct. 1944, 1952, 23 L. Ed. 2d 491 (1969) (citing 28 U.S.C. S. 2202). And pursuant to FRCP 70(e), courts may "hold the disobedient party in

contempt[]" when necessary to enforce a judgment for a specific act. "Courts have inherent power to enforce compliance with their lawful orders through civil contempt." *Allen v. Campbell*, No. 4:20-CV-00218-DCN, 2021 WL 2936129, at *3 (D. Idaho July 13, 2021) (quoting *Perez v. Sandpoint Gas N Go & Lube Center, Inc.*, No. 2:14-CV-00357-BLW, 2018 WL 6310268, at *1 (D. Idaho Dec. 3, 2018)).

### III.  ARGUMENT

#### a.  FIRST AMENDMENT FRAMEWORK

##### i.  Protected Speech

Maintaining a 24-hour tent-based vigil constitutes expressive conduct. Courts, including this one, have found that such an effort which is intended to communicate a particular message likely to be understood by its observers accomplishes that. *Occupy Columbia v. Haley*, 866 F. Supp. 2d 545, 557–58 (D.S.C. 2011) ("Plaintiffs have shown that they intend to communicate a particularized message that is substantially likely to be understood by those who observe their 24–hour occupation."); (Dkt. 17). Though the symbolism of a tent city was sufficient to protect Occupy Boise's speech in 2012, the symbolism is even more unmistakable—and poignant—here. Chantal Da Silva, Hala Gorani and Kayla McCormick, "'God help us': Displaced Gazans who fled bombardment now face health crisis in a makeshift tent city," *NBC News* (Dec. 13, 2023), https://www.nbcnews.com/news/world/israel-hamas-war-gaza-tent-city-rafah-bombardment-sheets-buckets-rcna129543. Though the permanent injunction in this case may not mean that all protests on the Capitol Mall may employ symbolic tents, the symbolism of the tents in this instance is undeniable.

Here, nexus between the erection and maintenance of symbolic tents and the core political message of the demonstrators, including Plaintiff, is undeniable: they are necessary to make clear and visible policymakers and the general public the conditions faced by people in Palestine as a result of genocidal military intervention. Millions of people have been displaced in the country and forced to reside in tent cities. The signs that demonstrators have placed on many of the tents at the vigil only make that communicative intent more obvious and more understood by their intended audience, reading variously that "THIS STRUCTURE IS A SYMBOL FOR THE UNHOUSED & DISPLACED IN GAZA!"; "RESERVED FOR THE SPIRIT OF MUDD WATTERS" – a reference to Edward Watters, the namesake of this action who has since passed away – "THIS STRUCTURE IS SYMBOLIC ART REPRESENTING THOSE DISPLACED BY US-BACKED GENOCIDE" (Decl. Neiwirth ¶ 7; Decl. Manwill ¶ 7).

The necessity of demonstrators' making visible the precise conditions faced by the people of Palestine because of this violence is made only more obvious by their previous alternative political actions attempting to, unsuccessfully, communicate the same message. Like the actions taken prior to the formation of the Occupy Boise vigil, demonstrators have engaged in letter-writing campaigns, phone banking, shorter marches and rallies at the Idaho State Capitol, and demanded in-person meetings with their representatives – none of which have proved successful. (Decl. Manwill ¶ 2; Decl. Tucker ¶ 2).

    **ii. Traditional Public Forum**

"First Amendment protections are strongest in traditional public forums, such as state capitol buildings, 'which by long tradition or by government fiat have been devoted to assembly and debate.'" *Boquist v. Courtney*, 682 F. Supp. 3d 957, 972 (D. Or. 2023) (*quoting Cornelius v. NAACP Legal Defense and Edu. Fund, Inc.*, 473 U.S. 788, 802, 105 S.Ct. 3439 (1985)). "The nature of a place, 'the pattern of its normal activities, dictate the kinds of regulations of time, place, and manner that are reasonable." *Grayned v. City of Rockford*, 408 U.S. 104, 116 (1972). And time, place, and manner restrictions may not be utilized to effectuate a "retaliatory animus". *Boquist v. Courtney*, 682 F. Supp. 3d 957, 973 (D. Or. 2023).

Here, Plaintiff and other demonstrators have maintained their vigil on the grounds of the Capitol Annex, directly across from the Idaho State Capitol. Defendants have refused to permit demonstrators to continue their vigil utilizing symbolic and assembly tents overnight on the grass of the Capitol Annex, or on the apron of the Idaho State Capitol, or at the site of the memorial located in the center of the grass near the Capitol Annex building. Defendants have refused them anywhere to maintain their protest on this traditional public forum. (Decl. Parsons ¶ 2).

Such restrictions reflect retaliatory animus. When Defendants informed demonstrators that they would be required to vacate the grass of the Capitol Annex each night at 6:30 PM, they complied. When they moved their vigil to the apron of the Idaho State Capitol, they were subject to enforcement action on the basis that they were blocking necessary ingress and egress to the building, despite the fact that the demonstrators clearly were not doing so. (Decl. Manwill ¶ 13, 15; Decl. Tucker ¶ 10-11). When members

11

of the vigil returned to the site of the Capitol Annex, they were might with signs indicating that they would not be permitted to continue utilizing on the grass on the basis that Defendants needed to conduct annual maintenance of the irrigation systems, despite the notice being dated for March 28, 2022 – the same sign, notably, utilized to evict the previous demonstration from the grounds of the Capitol Annex in which Plaintiff participated. (Decl. Neiwirth ¶ 9). And when demonstrators attempted to relocate to the grounds of the concrete memorial near the Capitol Annex, they were again not permitted to do so, despite once again blocking no ingress or egress to the Capitol Annex building itself. Defendants have again and again refused to identify a location where the vigil may continue overnight utilizing symbolic and assembly tents. (Decl. Parsons ¶ 2). It's clear that Defendants want to prevent this protest as much as they can, in violation of the permanent injunction in this case.

### iii. Unbridled Discretion

A law that confers unbridled discretion on a government agent creates the danger of, among other things, government censorship – as has been realized here. *See Kaahumanu v. Hawaii*, 682. F.3d 789, 807 (9th Cir. 2012). Without adequate standards to guide officials' decisions, it's also difficult to detect unconstitutional viewpoint discrimination and protect the public from it. *Id.* Anytime "the potential for exercise of such power exists, . . . this discretionary power is inconsistent with the First Amendment." *Id.*

Here, the enforcement actions of Idaho State Police reflect arbitrary exercise of discretion to restrict protected speech and assembly for several reasons. First, Defendants

have invoked IDAPA 38.04.06.310.04 to prevent demonstrators from relocating the site of their vigil from the grass of the Capitol Annex to the apron of the Idaho State Capitol, or to the monument in front of the Capitol Annex building, and rely on IDAPA 38.04.06.204 to prevent demonstrators from maintaining their vigil overnight using their symbolic tents on the grass of the Capitol Annex. Neither regulation imposes any objective criteria for when a temporary structure blocks an ingress or egress to a building on the grounds of the Capitol Mall, nor does either regulation confer any standard with respect to what constitutes an obstruction to the regular maintenance of the grounds of the Capitol Annex. Defendants are free to use those regulations to inhibit the expressive conduct of any demonstrator. Unbelievably, Defendants have simply recycled the signage – dated *2022* -- used to regulate the expressive conduct of the last vigil held at the grounds regarding homelessness and housing inequality in Boise. (Decl. Neiwirth ¶ 9). And Defendants are also applying absurdly broad views of what constitutes indicia of camping, using water bottles and puffy red eyes as excuses to quash protected protest, thus once again "stretching to suppress the core political message of [the demonstration]—its tents— as presented in a public forum." *Watters v. Otter*, 955 F. Supp. 2d 1178, 1183 (D. Idaho 2013); *cf.* I.C. § 67-2346 (codifying official state discrimination against concerted activity critical of Israel).

### iv. Ample Alternatives

The government that its speech and assembly restrictions in traditional public forums also provide ample alternatives for protected activity. *Berger v. City of Seattle*, 569 F.3d 1029, 1036 (9th Cir. 2009). Determining whether an alternative is ample is a

13

multi-pronged analysis. "An alternative is not ample if the speaker is not permitted to reach the intended audience." *Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1025 (9th Cir. 2009) (quoting *Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1229 (9th Cir. 1990). "[I]f the location of the expressive activity is part of the expressive message, alternative locations may not be adequate." *Id*. Courts also "consider the opportunity for spontaneity in determining whether alternatives are ample, particularly for political speech[]" and "the cost and convenience of alternatives." *Id.*

The Ninth Circuit in *Galvin v. Hay* held that the location of First Amendment activity is a crucial consideration. 374 F.3d 739, 749 (9th Cir. 2004). "In common experience, speakers rely upon location to inform the content of their speech. Television news reporters, for instance, routinely travel to locations that are illustrative of their stories even though they could read the same texts from their studios. Doing so does not change their intended audience. But speaking in front of a relevant backdrop gives greater force to the messages conveyed to that audience." *Id.* . The *Galvin* court held that "the significance of the location is primarily relevant to the speakers themselves, affecting the shared meaning of the ceremony for its participants." *Id.* at 749. "In sum, there is a strong First Amendment interest in protecting the right of citizens to gather in traditional public forum locations that are critical to the content of their message, just as there is a strong interest in protecting speakers seeking to reach a particular audience." *Id*. at 752. In order for a time, place, and manner restriction to provide an ample alternative, the inquiry "should include an inquiry into whether the regulation so alters the content of a message

14

in a public forum as to hamper speakers from conveying what they mean to convey." *Id*. at 756.

Defendants have failed to identify an ample alternative means of communication for two reasons. First, their proposed alternatives of continuing the vigil absent the use of symbolic and assembly tents overnights undercuts the core message of the demonstrators. Second, Defendants proposal to simply suspend the protest for the hours of 6:30 PM to 7:00 AM while ground maintenance occurs undercuts the importance of the ongoing nature of the vigil. Both the use of symbolic tents and the ability to continue their vigil on a 24-hour basis are crucial to the core message of the demonstrators. (Decl. Manwill ¶ 6-7; Decl. Tucker ¶ 4-5.) The use and maintenance of tents, and their ongoing presence, highlight the precise international conditions that members of the vigil seek to communicate to legislators, namely that thousands of individuals in Palestine have been forced to relocate to and reside in tent cities on an ongoing basis. *Id*. Failing to permit demonstrators to continue their vigil on an ongoing basis using symbolic tents undercuts that message precisely because individuals in Palestine do not have the option to tear down their tents at night and return home. Requiring demonstrators to do the same conveys precisely the oppose message that their speech-acts seek to communicate.

Moreover, as discussed above, alternatives *do* exist to continue in the vigil off the grass of the Capitol Annex if only Defendants would permit the vigil to use them: protestors, including Plaintiff, have clearly demonstrated their willingness to comply with Defendants' demands to permit maintenance of the grounds to continue. Instead of

15

simply allowing the vigil to continue on the apron of the Idaho State Capitol or at the memorial located in front of the Capitol Annex, Defendants have continued to concoct justifications to sweep the vigil and confiscate the demonstrators' property.

## IV. REQUESTED RELIEF

For the foregoing reasons, Plaintiff seeks further relief under 22 USC § 2202 based upon this Court's permanent injunction in the form of a preliminary injunction effectuating the following:

(1) That this Court hold that the current vigil of the Peoples' University with which Plaintiff is presently associated be afforded protection under the permanent injunction entered in this matter.
(2) That Defendants be required to provide specific criteria to justify the removal of any property from the ongoing vigil, including symbolic and assembly tents.
(3) That Defendants be required to provide Plaintiff's counsel with written, documentary evidence identifying the basis for the removal of any property from the ongoing vigil, including symbolic and assembly tents, within 6 hours of any such removal.
(4) Whenever Defendants contend the vigil must leave its location at any given time, that Defendants be required to identify an alternative space on the grounds of the Capitol Mall where the vigil may continue utilizing symbolic and assembly tents.

Plaintiff further asks this Court for an Order:

(1) For Defendants to Show Cause with respect to why it's enforcement actions against the vigil to date do not violate the permanent injunction in this matter.
(2) Warning to Defendants that further violations of the permanent injunction in this matter will result in escalating civil sanctions.

WREST COLLECTIVE

DATED: May 14, 2024        By:     /s/ Casey Parsons
                           Casey Parsons
                           Attorneys for Plaintiff Matthew Alexander Newirth